BAILEY B. NELSON v. THE VERMONT & CANADA RAILROAD Co.

*Railroad Companies. Legislative Enactments.*

The legislature may, by general laws, impose upon railroads new conditions, not contained in their charter, which are conducive to public interests.

The company owning a railroad will be liable for the acts of their lessees who run the road.

TRESPASS on the case, for running upon · and killing plaintiff's cow, alleged to have happened by the neglect and refusal of the defendants to erect a fence upon the side of their road, as by their act of incorporation they were bound to do, and to build upon the land of said plaintiff sufficient cattle-guards.

Plea, not guilty, and trial by jury.

The facts, pertaining to the questions passed upon and decided, sufficiently appear in the opinion of the court.

*B. H. Smalley* for defendants.

I. The act of 1845, incorporating the Vermont & Canada Railroad Company, was a contract between the state and the corporation.

(1.) This company is a private corporation as contra-distinguished from public corporations, and therefore, any act of the legislature altering or abridging any of the rights, or powers conferred by their act of incorporation is a violation of the constitution of the United States.

(2.) The act of 1849, requiring the company to put in cattle-guards on road-crossings impairs the rights given to the corporation by their charter. If so, it is a violation of the constitution of the United States, and .void on the ground of impairing the obligation of contracts. If the act of 1849, in relation to cattle-guards, is void, the company were not bound to put them in, and the charge of the court on this point was incorrect.

II. The Vermont & Canada Railroad Co., had transferred all their right to use the road to the Vermont Central Railroad Co., and the Vermont Central Railroad Co. had taken possession and were in the exclusive use and possession of the road at the

time the injury complained of occurred, and had assumed the responsibility of making and finishing the road and fences.

If the injury occurred in consequence of running the cars without sufficient cattle-guards or fences, the Vermont Central Railroad Company alone were responsible therefor, and not the Vermont & Canada Railroad Company.

*Stevens & Edson* for plaintiff.

In this case, the plaintiff insists that the defendants by their charter were bound to make and maintain the fences on each side of their road where necessary; and that they could not free themselves from their legal responsibilities by leasing their road to others; and that if the injury was caused wholly by the neglect of the defendants, they are liable in this action.

The opinion of the court was delivered by

REDFIELD, Ch. J.   A question of importance, and often of considerable difficulty, is made in this case; whether, and to what extent, it is competent for the legislature, by general laws, to impose upon railroads new and additional burdens not contained in their charters, after they have gone into operation.   The charter of this company requires them, in general terms, to fence their road upon both sides where a fence may be requisite for the owners or occupants of the adjacent places, and to make suitable and safe farm-crossings.   The general railroad act of 1850, requires all roads in the state, in addition to fencing and making farm-crossings, " to construct and maintain cattle guards, at all farm and road-crossings, suitable and sufficient to prevent cattle and animals from getting on the railroad."   We think it might be fairly said, that cattle-guards are necessarily implied, in fencing a railroad, and making proper and safe farm-crossings.   But we know that in practice it is not always done, perhaps not generally.   It may be proper therefore, for the courts to consider the general power of the legislature over these corporations, after they have obtained their charters, and gone into operation, in regard to such matters.

It is certain, we think, that the legislature cannot impose new burdens upon corporations, under such circumstances, which are merely and exclusively of private interest and concern, and which have nothing to do with the general security, quiet and good order.

But there can be no doubt, they have the same right of general legislation over these corporations, which they have over natural persons. By general laws, they may require them to conform to such regulations of a police character, as they may deem for the security of the rights of the citizens generally, and most conducive to quiet and good order, and the security of property, and even the life of animals. For this latter is a subject to which the legislation of the British Parliament, and of this, and most of the American states, has always extended, in the form of penal restrictions. And if the running of railroads, under present restrictions, was found cruelly and recklessly destructive, even of the lives of domestic animals, it would be strange if the legislature could not interfere, upon the general maxim, that every one shall be bound and required, *sic utre tuo, ut alienam non laedas.* The subject of division fences between adjoining proprietors, has always been regarded as under the control of the legislature. There is no doubt, they may alter the laws upon that subject, so as to require fences to be built higher than is now required by law, which would no doubt be imposing an additional burden upon the adjoining proprietors. And this matter of fences and cattle-guards, and farm-crossings, between the railroad company and the proprietors of land, is much the same thing as the division fence between adjoining proprietors. But the reason for allowing an interference, in the case of railroads, is far more striking and obvious, in the instance, but the same in principle probably, as that of other adjoining land owners. And there is an additional ground of allowing the legislature the right to control this matter, which probably does not effect the present case, but which is included in the general subject; I refer to the great necessity of stringent regulations, to exclude cattle from the railroads, for the security of travelers, and the operatives upon such roads. To deny the legislature the control of the railroads in the state, in regard to fencing, both as to the fact and the mode of execution, would be to deny one of the most important and indispensable powers in regard to the regulation of the police of the state, the denial of which would be likely, in the long run, to prove quite as detrimental to the railroads as to the public. And it is precisely analogous to those compulsory requisitions, which the legislature in this state have always been accustomed to control, as to common highways, and with reference

to natural persons.   For a long time, and until 1840, land owners were required to maintain legal fences, adjoining the highways, in order to justify making distress of cattle, damage *feasant.*  Since that time they have not been required to fence, adjoining the highway, and now all persons are forbidden to let their cattle, &c., run in the highway, which probably was intended, *off the land of the owner*, for to that extent it is questionable how far the legislature could prohibit the proprietor from depasturing the herbage, with his cattle ; but undoubtedly they may require him to keep his cattle at home, as was always the common law or they may require him to fence in the highway, and in any mode they deem necessary and expedient.   And so equally may they do in regard to railways.

There are many other matters of a similar character, which are connected with the security of life and property, to which I refer, by way of illustration merely, and the power of which has never been seriously questioned, as residing in the legislature.   For instance, putting up signboards cautioning travelers of a railroad crossing, ringing the bell, or blowing the whistle at such crossings. And it has not been doubted but the legislature might require railroads to pass all common highways, either above, or below grade, or to come to a dead stop, before passing stations with express trains, as is required of all trains in Connecticut, before passing drawbridges ; or to keep men stationed with signals, in sight of each other, as is done upon some roads, as one of their own police regulations, or not to run above a given rate of speed, or not to run locomotives in frequented places, and all similar regulations, obviously pertaining to the police of such corporations, and sensibly affecting the security of public travel, and the quiet and comfort of common life, to an indefinite extent.   And these are all of a similar character to the one under consideration.

We need not probably illustrate this subject further to render it obvious to all minds.   But the acknowledged legislative control over banks which, like railroads, partake somewhat of a public character, although based upon private stock, will perhaps throw some light upon it.   There is no doubt that existing banks may be restricted, by general laws, from issuing bills of a given denomination, as has sometimes been done in regard to small bills, or from dealing in particular securities deemed detrimental to public security, as bills on time, or payable in stocks on time, or in bills

Nelson v. The Vermont & Canada Railroad Co.

of other banks below par, or that they might be even limited, in regard to discounts, and interest even, by general law, as was done, in many of the states, in former times of commercial distress. But the legislature could not require such banks, to discount at all or not to take interest, or to remit a portion of their debts, or to suspend the collection of them, or to take pay in goods, or land, at the appraisal of men. This even was attempted, in some of the states, but was held to be a violation of the vested rights of such corporations. The proper distinction is, between what is necessary for the public security, and what is merely of the private concern of such corporations, and no way affecting the public security and essential to their own corporate functions.

As to the liability of the defendants for the acts of their lessees, who were running the defendants' road, under a long lease, we think there can be no doubt. Unless we can hold the defendants thus liable, they might put their road into the hands of corporations, or individuals of no responsibility. It was on this ground that the English courts denied the legality of one road leasing itself to another, or to private persons, and the consequent loss of security to the public, without consent of parliament. *Beman* v. *Rufford*, 6 Eng. L. & Eq. 106. *Great Northern Railway Co.* v. *The Eastern C. R. Co.*, 12 *ib.* 224. *Norwich* v. *B. & L. R. Co.*, 13 *ib.* 506. The lessors must, at all events, be held responsible for just what they expected the lessees to do, and probably, for all which they do do, as their general agents. For the public can only look to that corporation to whom they have delegated this portion of public service. Certainly they are not bound to look beyond them, although they doubtless may do so. The lessors should see to it, that their road is properly fenced, before they suffer it to be run by any one.

Judgment affirmed.