Ballou, Adm'x, vs. The Chicago, Milwaukee & St. Paul R'y Co.

BALLOU, Administratrix, vs. THE CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

*January 18 — February 7, 1882.*

| 54 | 257. |
|----|------|
| 76 | 143 |
| 54 | 257 |
| 80 | 289 |
| 54 | 257 |
| 81 | 421 |
| 54 | 257 |
| 83 | 285 |
| 54 | 257 |
| 88 | 448 |
| 54 | 257 |
| 90 | 93 |
| 54 | 257 |
| 105 | 348 |

RAILROADS. *Negligence of one company in respect to construction of freight cars of other companies used on its road.*

1. In an action against a railway company (under sec. 1816, R. S.), for injuries to an employee, where the whole evidence shows beyond dispute that the sole cause of the injuries was the use of one bolt of insufficient length in fastening a slat of the ladder of a freight car, together with the somewhat decayed condition of the wood at the place of such bolt, and that there was no external indication of these defects, and the person injured had been frequently in charge of the same car and in the habit of using the same ladder — there was no error in directing a nonsuit.

2. One railroad company receiving a loaded car from another, and running it upon its own road, is not bound to repeat the tests which are proper to be used in the original construction of such a car, but may assume that all parts of the car which *appear* to be in good condition, are so in fact.

TAYLOR, J., dissents from the judgment.

APPEAL from the Circuit Court for *Winnebago* County. Action for injuries to plaintiff's intestate, causing his death. The case is thus stated by Mr. Justice CASSODAY:

"At the time of his death, the intestate was employed as brakeman on a regular freight train of the defendant, run between Oshkosh and Fort Howard, under the conductorship of one Sykes, and had been in such employ for three years. On the day previous to his death, freight car No. 57, belonging to the Green Bay & Minnesota Railroad Company, was taken by the train upon which the deceased was employed, from that company at Fort Howard Junction, loaded with charcoal, and drawn to Fort Howard, and from there it was taken in the train, on the return trip, to Depere, to which place it was consigned, and was there left. On the return of this train from Oshkosh the next day, it stopped at Depere, and,

leaving the larger part of the train on the main track, the engine No. 29 and tender passed onto the side track or switch, and the deceased hitched this car No. 57 to the front of the engine, and then the engine backed out onto the main track and started to get another car, going up to near Bolles' side track with No. 57 attached, and the deceased riding upon the top of it, when it stopped, and the deceased climbed down the ladder at the north end of this No. 57 (being the forward end) and, turning the switch, gave the ordinary signal with his hand to the engineer to go ahead, and said, 'Go ahead, Fred!' which he did; and then while the engine, together with this car No. 57, was moving at the rate of two or three miles an hour, the deceased, being upon the ground, seized one of the rounds of this same ladder with his left hand, and then reached another round with his right hand, and, giving a spring, struck the bumper with his left foot, when one of the slats or rounds of the ladder, about seven feet from the ground, which he had hold of, gave way, and he fell backward upon the track, and car No. 57 ran over him, and killed him instantly. The distance between the place where the car stood when the signal was given, and the place to which it was going to get the other car, was some eight or ten rods, and the surface of the ground in the space between was level, except the tracks, and there was no difficulty in walking over it.

" The slat or round which gave way was about three feet long, two inches wide, and one inch and a quarter thick at one end, and one inch and three-eighths at the other end, and was made of oak timber. The ladder consisted of four slats or rounds of this size, fastened at each end with screw bolts, to oak stanchions standing upright near the middle of the end of the car, and forming a part of the end of the car, as timbers or studding, the lower ends being in stake holes, as it had previously been a flat car. The bolts were three-eighths or seven-sixteenths of an inch thick; and the one that came out only passed into the stanchion about one-half of an inch of the threads,

whereas it should have passed in to the extent of one and a half or two inches. The bolt did not break, but pulled out of the stanchion, with the threads of the screw filled with the wood. A small portion of the stanchion, at the place where the screw went in, was decayed, and another hole indicated that a screw had previously broken off. This decay near the screw, and the hole, were concealed from observation by the slat or round while the same was in place and before it gave way. The same train, with the same brakeman, had been in the habit of handling this same car, No. 57, once or twice a week during the year previous. The accident occurred between three and four o'clock in the afternoon of 'a nice, bright day.' The brake on car No. 57 was at the top of the car, near the ladder in question; but there was nothing requiring the deceased to get upon the car, as he could easily walk the short distance necessary to couple on the other car.

"The deceased had frequently ascended and descended the ladder in question, and others on other coal cars of the Green Bay & Minnesota road, constructed the same way as this, and having the same general appearance, and was familiar with the car and the ladder. The train on which the deceased was so employed had for a long time been in the habit of handling almost daily other foreign cars having ladders at the end, including cars from the Baltimore & Ohio Railroad, the Lake Shore & Michigan Southern, the New York Central, the Hudson River, the Grand Trunk, the Pittsburgh & Fort Wayne, the Chicago, Rock Island & Pacific, and other railroads; and no injury had previously been known to occur from such ladders or from any defect in such ladders.

. "At the close of the testimony on the part of the plaintiff, the defendant moved for a nonsuit on the ground that it appeared by the testimony of every witness that when the ladder, slat or round was screwed upon the stanchion, no person looking at the head of the bolt, seeing it in the position in which it was, would have supposed, or been charged with any reason to sup-

pose, that it was different from what it appeared to be, and from what ladders of a similar description, bolted in a similar manner to that, would be presumed to be. The court granted the motion substantially upon the grounds stated, and in doing so the trial judge, among other things, said: 'I understand the testimony of the plaintiff [to be] that the defect which caused this injury was the drawing out of the screws which held the rung upon the stanchion. All the witnesses agree that substantially there was nothing externally that would indicate that the bolt was not of the ordinary depth or length that is used in such places, to wit, three inches to three and a half; that the head would indicate the diameter. All that have said anything upon the subject have given the opinion, and all the experts, that had the bolt been of such a length as is usual in such places, it would not have pulled out, in their judgment. Clearly and fairly, that being so, the evidence to me shows conclusively that no degree of care that the railroad would be called upon to exercise would have discovered the defect, to wit, the drawing out of the bolt.' From the judgment of nonsuit thereupon entered, the plaintiff appealed.

*Gabe Bouck*, for the appellant.

For the respondent there was a brief by *William F. Vilas*, its attorney, with *C. W. Felker*, of counsel, and oral argument by *Mr. Vilas*.

CASSODAY, J. The gist of the complaint is, that the intestate came to his death by the wrongful act, negligence and default of the defendant, and without any fault, carelessness or negligence on his part. The cause of action accrued prior to the repeal of section 1816, R. S., and was expressly saved by the repealing act (chapter 232, Laws of 1880), and hence must be governed by that section. The intestate was, at the time he was killed, a servant of the defendant, and the only question to be determined is, whether his death was caused by reason of the negligence of any other agent or servant of the defend-

ant, without contributory negligence on the part of the deceased. *Gumz v. Railway Co.*, 52 Wis., 676. Clearly, under that section, the burden was upon the plaintiff of proving that such death was by reason of the negligence of some "other agent or servant" of the defendant. There is no claim of any negligence on the part of the conductor of the train. There is no claim that the engineer was negligent in starting the engine and car, and running them in the manner and with the speed he did. On the contrary the evidence is undisputed that he started them in pursuance of the signal and command of the deceased. Manifestly the only defect which at all contributed to the injury was the shortness of the bolt fastening the slat or round in question to the standard or stanchion.

Was the defendant guilty of negligence by taking that car loaded with charcoal from another railroad and handling it as it did? A very careful reading and rereading of the printed case forces upon us the conviction that the learned circuit judge's summary of the evidence above given, as to the defendant's negligence, is substantially correct. It is true, the evidence tended to show that the heads of such bolts indicate their size, and that the head of the bolt in question indicated that it was three-eighths or seven-sixteenths of an inch thick, whereas such bolts were ordinarily one-half an inch thick. But the difference was very slight, and, as stated by the trial judge, there was no breakage of the bolt, but it pulled out solely by reason of being too short, and hence not having penetrated the stanchion to a sufficient depth. From the evidence it is clear that had the penetration been of sufficient depth it would not have broken nor pulled out. It is true that one of the witnesses, who had once been discharged from the defendant's employ, and testified with an apparent bias, did say, in one portion of his testimony, that the head of the bolt indicated that it was too short; but after a rigid cross examination he was compelled, reluctantly, to admit, what all the other witnesses most clearly state, and what reason fully corroborates,

and that is, that no one could tell from simply looking at the head of the bolt what its length was.

It is true, one of the witnesses states that he examined the other rounds in the ladder on this car, and the bolts, and that they seemed to be half-inch bolts. It does not appear, however, that the heads of such other bolts were any larger than the one in question. On the contrary, it was stated on the argument, without any dissent, that the evidence indicated that the heads of the bolts were apparently alike. This we assume to be correct, especially as it was stated without contradiction that much of the evidence was not printed. But even if there was a slight difference in the size of the heads, indicating one-eighth or one-sixteenth of an inch difference in the size of the bolts, yet, since it is clear from the evidence that the injury did not result from insufficiency in size, it would seem to be immaterial. It is true, as urged by the learned counsel for the plaintiff, that there was some discoloration on the stanchion just below the slat or round in question, and immediately under the place where the bolt in question penetrated the same, caused by water and rust passing down between the slat or round and the stanchion. But, from the evidence, such discoloration seems to be quite common, and does not necessarily imply rot or substantial decay. The car was rough, and so was the use to which it was put; but roughness in appearance does not necessarily imply want of strength.

Had the conductor, or any other agent or servant of the defendant, prior to the injury, known of the shortness of the bolt, and the condition of that part of the stanchion directly under the slat or round, as they were revealed on examination after it came off, then such use after such knowledge would have been negligence within the meaning of the statute; and in such case, if the deceased was free from contributory negligence, there would be no question but that the plaintiff could recover. But the evidence fails to show that any agent or servant of the defendant had any such knowledge, or any knowl-

edge, of any condition of the ladder or car, perceivable to the eye, which would naturally induce a man of ordinary skill in such matters, in the exercise of ordinary care, to discover the precise defect which led to the injury. Of course, it was discoverable by taking out the bolts and looking beneath the slats or rounds. So the sufficiency of the bolts, as to length as well as size, might have been determined by the application of a heavy weight, or by a strong man, or some machine, wrenching the same. Assuming that some such test should have been applied, the questions would remain, when, by whom, and how frequently? If properly tested by the manufacturer, then is it to be repeated by the purchaser and every one who uses the same? and if so, shall he go beyond ordinary inspection, while at rest or in use, to the extent of unmaking what has already been made?

There is much propriety in the law exacting rigid tests to the different parts in the first instance, and while a car is in the process of manufacture, which would be impracticable, if not impossible, to repeat every time a loaded car passed from one railway company to another. Is one railroad company, receiving a loaded car from another railroad company, bound to assume that such car was not properly made; that the materials used in its construction were unsuitable or defective; that the workmanship was unskillful? Or may the company so receiving properly assume that such loaded car was skillfully made of suitable materials, and that all the requisite tests in the manufacture of such car had been applied? Is the company so receiving bound not only to use such care as is required of those handling and drawing such car, but also such care as is required of the manufacturer in the selection of materials, the application of tests, and the exercise of skill in the building? May not the company so receiving such loaded car, and without being chargeable with negligence, assume that all parts of such car which appear to be in good condition are in such condition? Is the law so exacting as to the

management of railroad trains as to impute negligence in not discovering what ordinary care would fail to detect? Is the law so stringent in such a case as to infer negligence without any omission of duty? Reference to the authorities may aid us in the solution of some of these questions.

In *Wedgwood v. Railway Co.*, 41 Wis., 478, the brakeman was injured while coupling freight cars by a large and long bolt being out of place, and, as alleged, unnecessarily projecting. It was there held that "a master is liable for injuries suffered by his servant, where, by his own *negligence* or malfeasance, he has *enhanced* the risk to which the servant was exposed beyond the *natural risk* of the employment, or has *knowingly, and without informing the servant*, used defective machinery which has caused the injury." On a subsequent appeal of the same case, it was held, in effect, that such projection of the bolt, if a defect, was an obvious one, readily detected by inspection, and hence that negligence might be inferred without the plaintiff proving that the defendant had actual notice of such defect. In this respect the case was clearly distinguishable from the one before us.

In *Smith v. Railway Co.*, 42 Wis., 520, the brake-staff or rod on a wood train broke just below the cog-wheel, near the top of the car, on account of an old crack or seam in the same, in consequence of which the plaintiff, who was brakeman on the train, was thrown upon the track and suffered severe injuries. The plaintiff in that case obtained a special verdict and judgment in his favor; but it was reversed "for the reason that there was no evidence which warranted the jury in finding that the defendant was guilty of negligence in not applying a proper and sufficient test to the brake-rod," notwithstanding the jury did find "that the defendant, by the exercise of ordinary care, skill and diligence, might have known of the defect," though it did not. It did not appear whether the car with the defective rod had been purchased by the company or manufactured in its shops. "It was a new flat car, which had

been taken into the train but two or three days prior to the accident, and appeared to be a good car." It appeared that the company applied the ordinary tests in manufacturing cars, and the ordinary inspection on the purchase of cars. But the opinion states that, apparently, "the defect in the brake-rod was a latent one, which would not likely be detected or discovered by the usual examination or inspection of the car," and that "it would undoubtedly be impracticable to apply tests to every brake-rod which is used upon defendant's cars, and, if compatible with the nature of the business, would be of doubtful utility. There should be at least some testimony tending to show that the tests applied to determine the sufficiency of the brake-rod were inadequate, and not in accordance with the most approved methods, to justify the finding of the jury." Page 525. Again the court said: "The servant, then, takes the risks of the employment, and of a failure of the machinery *from any latent defect* not discovered by practical tests." Page 526. Such was the language of this court as to the degree of care requisite in a railroad company using cars manufactured or purchased by the company so using the same. Certainly the rule cannot be less favorable to a railway company which neither manufactured nor purchased the defective car, but merely received it, loaded with charcoal, from another company, for the simple purpose of drawing it to the place of consignment and then returning the empty car.

In *Morrison v. Construction Co.*, 44 Wis., 405, the injury was caused by the breaking of a wheel under a freight car in the train, which threw the car containing the plaintiff's horses from the track. The track was in good order; the wheel had been used only a short time, and, upon inspection after the accident, showed no flaw or defect; and there was no evidence, except the mere fact of its breaking, which tended to show negligence of the company, and it was "held that there was no error in directing a verdict for the defendant." It is true, the liability of the defendant in that case was limited by the con-

tract of carriage, but that does not render the decision inapplicable, because it was made to "turn and be determined upon the question whether the defendant was careless, negligent or in fault in producing the injury complained of." Page 409.

In *Steffen v. Railway Co.*, 46 Wis., 265, the late chief justice said: "There may be latent risks in an employment. Where these are known to the master, it is his duty to notify the servant; but when they arise from no negligence of the master, but are incident to the nature of the service, and unknown to the master through no negligence of his, the risk is with the servant, not with the master." In *E. St. L. P. & P. Co. v. Hightower*, 92 Ill., 139, the fireman was injured by reason of a defective blow-off pipe, and the court held: "A servant cannot recover of his employer damages for an injury received while in the discharge of his duty, from a defect in machinery used, without showing that the employer had knowledge, or might have had knowledge, of the defect by the use of reasonable diligence." *I., B. & W. Railway Co. v. Toy*, 91 Ill., 474.

In *De Graff v. Railroad Co.*, 76 N. Y., 125, the brakeman on a freight train was injured by reason of the breakage of the chain in applying the brake. From the plaintiff's evidence it appeared that the "company's inspectors were in the habit of examining the brake chains to see if they were in their place and *apparently sound, but did not test their strength.*" The court, however, from all the evidence, "held that the evidence justified a finding that there was some defect in the chain, but not that it was defective when put in, or that it could have been discovered by the exercise of ordinary care, or that such care was not used; and that, therefore, a refusal to nonsuit was error."

In *Warner v. Railway Co.*, 39 N. Y., 468, the plaintiff was injured by reason of the fall of a defective railroad bridge, but it appeared that "the defect was such as was not apparent, and of which it had no notice," and it was held that the rail-

way company was not liable. Thus the authorities seem pretty clearly to establish the rule that where the injury is the result of a latent defect, of which the master has no prior knowledge, and which was not discoverable by the exercise of ordinary care, such master will not be held liable. Here, as we have noticed, the car having the defective ladder was not manufactured by and did not belong to the defendant. It may be that the ladder was not constructed in the most approved method.

In *Baldwin v. Railway*, 50 Iowa, 680, it was held that "it does not constitute negligence for a railway company, in the ordinary course of business, to receive and transport the cars of other roads, in general use, which may not be constructed with the most approved appliances, and the transportation or use of such cars by the company is one of the risks which an employee assumes in undertaking the employment." In such case it would seem, upon principle, that the company so receiving a loaded car from another company is entitled to the benefit of the presumption that such car had been properly constructed of suitable material, and had passed the inspection of some one of ordinary skill in such matters, and was reasonably fit for the use to which it was devoted when so received. See *Davis v. Railroad,* 20 Mich., 105. Certainly a railroad company is not required, under all circumstances, to make use only of the safest known appliances and instruments, and to be held responsible for any failure to discard what is not such, and supply its place with something better and safer. *Ft. W., I. & S. R. R. Co. v. Gildersleeve,* 33 Mich., 133. To hold, in such a case, that a railway is liable, and to apply such a rule to a company receiving a loaded car from another railroad, would, in many instances, operate as a prohibition upon interstate commerce. The company is not to be treated as the guarantor of the sufficiency and safety of the cars and machinery of the train, but as responsible only where the injury is without fault of the employee, and the result of the neglect of

that ordinary and reasonable care and diligence in furnishing sufficient and safe cars and machinery for the train, which appertains to that particular branch of business. *M. R. & L. E. Railroad Co. v. Barber,* 5 Ohio St., 541.

It appears from the testimony that the ladder in question was almost in constant use, not by the engineer, nor so much by the conductor, but by the brakeman. The straining test was necessarily applied whenever the brakeman ascended or descended the ladder in question. Such constant use was necessarily by men having eyes, and hence, when the car was in use, the ladder must have received frequent inspection. The defendant company could only inspect and test by the agency of some employee present at the ladder. The brakeman was such employee, and apparently the only one having, at the time in question, charge of the brake on the car, as he had frequently had before, and necessarily tested and inspected the ladder the insufficiency of which is now complained of. His inspection and testing was the company's inspection and testing. His failure to discover any visible indications of insufficiency, while so inspecting and testing, was no more culpable in the company than in himself. Is it logical to hold that, in such practical testing and inspection, his failure to notice visible indications of insufficiency was the exercise of ordinary care, and yet that the invisible entity known as the corporation, looking through his eyes, and using his feet and hands, as much as any other servant of the company, was guilty of negligence in omitting to detect and guard against what he failed to discover? Was the insufficiency of the ladder latent as to the brakeman using the same, but patent as to the company for whom he so used it? Or can it be said that the company was in the exercise of ordinary care so far as inspecting and testing by its brakeman present at the ladder was concerned, but negligent by reason of the failure of some unnamed servant, not present, to apply some unnamed test?

These brakemen, to use the language of Ryan, C. J., in

*Steffen v. Railway Co., supra,* " appear to have been employed to perform this very duty . . . at the *locus in quo.*" Is the standard of ordinary care of the corporation acting through the brakeman, on the part of the company, so much more stringent than on the part of the brakeman acting for himself, and in view of his own personal safety and life? In the Ohio case cited, the conductor sued the company for injuries sustained by reason of defective cars, but he was " held to ordinary and reasonable care and diligence, not only in the management of the train, but also in the due inspection of the cars, machinery and apparatus of the train, as to their sufficiency and safety." Of course, the company is required to use proper care in furnishing safe and sufficient cars and machinery for the train, but that does not relieve the employee from the exercise of ordinary care. Whether ordinary care requires such employee to inspect or test the part of the car or machinery which so turns out to be defective, would seem to depend very much upon the character of the particular employment, and his relation to and connection with such defective part prior to the injury. It has frequently been held that " an employee who has knowledge of defects in machinery about which he is employed, or who might know them by the exercise of reasonable care, cannot maintain an action for injuries resulting therefrom, if he continues in the employment without objection." *Way v. Railroad Co.,* 40 Iowa, 341; *Kroy v. Railroad Co.,* 32 Iowa, 357; *McGlynn v. Brodie,* 31 Cal., 376; *Devitt v. Pacific Railroad Co.,* 50 Mo., 302; *Dillon v. Railroad Co.,* 3 Dill. C. C., 320; *Sullivan v. India Manuf'g Co.,* 113 Mass., 396; *T., W. & W. R. R. Co. v. Black,* 88 Ill., 112.

In *Hayden v. Smithville Man. Co.,* 29 Conn., 548, it was held that." an employee cannot recover for an injury suffered in the course of his employment, from a defect in the machinery used by his employer, unless the employer knew or ought to have known of the defect, and the employee did not know of it or had not equal means of knowledge." The fair-

ness of such a rule cannot well be questioned, as it places both parties upon an equality; and it is not materially different from the rule frequently recognized by this court. *Dorsey v. Construction Co.*, 42 Wis., 583; *Flannagan v. Railway Co.*, 45 id., 98; *S. C.*, 50 id., 462. See also *Clark v. Railroad Co.*, 2 Am. & Eng. Railroad Cas., 240; *Smith v. Potter*, 9 N. W. Rep., 273.

Beyond question, the fastening of the slat or round was insufficient, and was culpable negligence on the part of the person or corporation under whose supervision it was so fastened; but, since it was in apparent good condition, we do not think the defendant receiving the car loaded for transportation and handling it, is guilty of the neglect of another to one of its servants in the habit of handling the same car, and having the same knowledge and means of knowledge as the defendant. Besides, we are to remember that at the time of the injury the slat or round in question must have received an unusually severe strain from the swinging, wrenching method which the deceased adopted to board the car, which boarding at the time was purely a matter of his own choice, and without necessity.

For the reasons given, the judgment of the circuit court must be affirmed.

TAYLOR, J. This action is brought to recover damages for negligently causing the death of Thomas Ballou. The evidence on the trial shows that the deceased had been a brakeman in the employ of the defendant company for several years previous to his death, working on the appellant's road between Green Bay and south of that point; and that he was killed at Depere while assisting in the moving of some cars at that point. His death was caused by the giving way of one of the rungs of the ladder while he was attempting to ascend the same to the top of the car. The ladder was at the end of the car, and when the rung of the ladder gave way he fell in front of the moving car, and was run over and instantly killed. It appears that, in

order to mount the ladder, the deceased took hold of one of the rungs of the ladder, threw his feet upon the bumper, then reached up and seized the rung above with his other hand, and so in straightening himself to get on the ladder most of his weight would come upon the upper hand, and the rung giving way before he was straightened up on the ladder, he necessarily fell to the ground and was run over by the car and killed.

The reason why the rung gave way was apparent, when examined after the accident. The car was a coal car, made for hauling charcoal, and was originally a flat car. The box had been put on it by setting up oak stanchions around the sides and ends, fastened at the bottom to the bed of the car, and at the top by cross-timbers, which supported the deck or roof of the car, and was boarded up on the inside of the stanchions so that the frame-work of the car was on the outside. The ladder was made at one end by simply fastening flat slats or rungs to two of the stanchions which formed the box of the car, and these slats or rungs were fastened to the stanchions, at each end, by a single bolt, with a screw at the end, passing through the slat or rung into the stanchion. On examining the rung which gave way, it was found that the bolts at each end were too short, not penetrating the stanchions more than about a half inch, so that when the weight of the brakeman came upon it, combined with the outward strain which was given to it in his attempt to bring himself upon the ladder, it immediately gave way.

The evidence also shows that this car did not belong to the defendant company, but to the Green Bay & Minnesota Railroad Company, and was received by the defendant company at Green Bay to be hauled to Depere, where its loading was to be discharged, and then returned to the Green Bay Company at Green Bay; and that this and other cars of a like make had been frequently received by the defendant company from the Green Bay Company, for the purpose above specified, while the deceased had been in its employ. There is no dispute

Ballou, Adm'x, vs. The Chicago, Milwaukee & St. Paul R'y Co.

made by the defendant that the rung of the ladder which gave way was not, in fact, securely fastened, nor that, if it had been securely fastened, the accident would not have happened. That the bolts were too short is admitted by all. It was said by the learned counsel for the respondent company, that the fastenings of the other rungs of the ladder had been examined after the accident, and it was found that the bolts in them were much longer than those in the rung which gave way; that the bolts in the remaining rungs entered the stanchions at least an inch and a half or two inches. There was, however, no evidence of this fact given on the trial.

One of the witnesses for the plaintiff, who examined the ladder shortly after the accident happened, testified that he found a hole in the stanchion just beside the place where the bolt which gave way entered the same, and that in that hole there appeared to be part of a bolt which seemed to have been broken off and left in the wood; and from this fact it may well be inferred that the rung which gave way had been put on in the place of another which had before that time occupied the same place, and had by some means been broken off, leaving a part of one of the bolts which held the same in the stanchion. This inference would be strengthened by what is alleged by the learned counsel for the respondent, that the remaining rungs were fastened with much longer bolts. Had they all been put on at the same time, there is a strong presumption that the bolts fastening the same would have been of the same length. There was no evidence showing conclusively any contributory negligence on the part of the deceased.

There was some evidence given by the plaintiff tending to show that a competent mechanic could tell by the size of the bolt heads that they were both too short and too small for the purposes to which they were put, and also that there was some slight indication of decay in the wood at the place where the bolts penetrated the same. This evidence was, however, of a very unsatisfactory kind, and so slight in itself that I am not

prepared to say it was sufficient to sustain a verdict in favor of the plaintiff, in the absence of any duty upon the part of the plaintiff to have ascertained the unsafe manner in which this fatal rung was fastened, except the duty which would arise by reason of the indications spoken of by the witness. There was no evidence given on the part of the defendant showing that any inspection had ever been made of this car by any person, either competent or incompetent, nor any evidence of what were the ordinary methods among railroads of inspecting cars which came to them from other roads. The learned circuit judge, on the motion of the respondent, nonsuited the plaintiff, and the plaintiff appeals to this court. It is admitted by the learned counsel for the respondent — and if it were not, it seems to me that it is too well settled to be controverted, — that had this action been against the company which was the owner of the car and using the same, by an employee of that company who had been injured by the giving way of the rung in question, there could be no doubt as to the right of the plaintiff to a verdict upon the evidence offered in the case, or, at least, to have had the question of negligence on the part of the defendant submitted to the jury.

The evidence disclosed such a glaring defect in the construction of the ladder, so threatening to the lives and limbs of those who, in the discharge of their duties, were compelled to use it, that no court would say that it was not evidence tending to show a want of ordinary care on the part of the company in using so dangerous an appliance for the accomplishment of its work. If the rung was put on as a repair in place of another which had before given way, the company would be held liable for the careful making of such repair by the person or persons detailed by the company for that purpose. All the cases hold that the company must be treated in such case as doing the work in its individuality to the same extent as though the insubstantial entity which is called the corporation did the act itself. Its employee for that purpose is the com-

pany, and the carelessness or negligence of such employee is the carelessness or negligence of the corporation. To establish this doctrine it is unnecessary to look to other courts for authority. This court has determined the question for itself. *Brabbits v. Railway Co.*, 38 Wis., 289; *Wedgwood v. Railway Co.*, 41 Wis., 478; *Schultz v. Railway Co.*, 48 Wis., 375.

My opinion is that the same rule would apply to the company owning and using the car, as between itself and one of its employees, wherever such company is itself the maker of such car or other machinery. I think that in such case, as between the corporation and employee, the corporation warrants that its appliances are made of sound material, and that the workmanship is not faulty, but is sufficient in every respect to answer the purposes for which they are intended; and that if the persons making such appliances are careless either in the use of materials or in the workmanship, and an injury occurs to an employee by reason of such carelessness in either respect, such carelessness is the carelessness of the corporation, and for such carelessness it is answerable. No defect is latent, so as to excuse the corporation, either in the materials or in the workmanship, which is known to its employees engaged in its manufacture, or which would have been known to them if they had exercised due care. *Smith v. Railway Co.*, 42 Wis., 520, 526. In the last case, the present chief justice, in delivering the opinion, quotes approvingly the following from the opinion in the case of *Laning v. Railroad Co.*, 49 N. Y., 521: "That the duty of the master to the servant, or his implied contract with the servant, requires that the servant shall be under no risk from imperfect or inadequate machinery, or other material means or appliances, or from unskillful or incompetent fellow-servants of any grade. It is a duty or contract to be affirmatively and positively fulfilled and performed. And there is not a performance of it until there has been placed for the servant's use perfect and adequate physical means, and for his helpmates fit and competent fellow-servants;

or due care used to that end. *That some general agent, clothed with the power and charged with the duty to make performance for the master, has not done his duty at all, or has not done it well, neither shows a performance by the master, nor excuses the master's non-performance. It is for the master to do by himself or by some other.* When it is done, and not till then, his duty is met or his contract kept."

And, after making the foregoing quotation, the chief justice adds: "The servant then takes the risks of the employment, and of a failure of the machinery from latent defects not discovered by practical tests. And this court, moreover, has held expressly that the negligence or misconduct of the officer or employee whose duty it is to attend to these things, and who, *pro hac vice, represents the company in the matter, is the negligence or misconduct of the company itself.*" The same doctrine was approved by this court in the cases of *Bessex v. Railway Co.*, 45 Wis., 477, and *Wedgwood v. Railway Co.*, 41 Wis., 478; *S. C.*, 44 Wis., 44. This doctrine is approved in *Ford v. Fitchburg Railroad Co.*, 110 Mass., 241. It that case the court state the rule as follows: "The rule of law which exempted the master from responsibility to the servant for injuries received from the ordinary risks of his employment, including the negligence of his fellow-servants, does not excuse the exercise of ordinary care in supplying and maintaining proper instrumentalities for the performance of the work required. One who enters the employment of another has a right to count on this duty, and is not required to assume the risks of the master's negligence in this respect. The fact that it is a duty which must be always discharged, when the employer is a corporation, by officers and agents, does not relieve the corporation from that obligation. The agents who are charged with the duty of supplying safe machinery are not, in the true sense of the rule to be relied on, *to be regarded as fellow-servants of those who are engaged in operating it. They are*

*charged with the master's duty to the servant. They are employed in distinct and independent departments* of service, and there is no difficulty in distinguishing them, even where the same person renders service by turns in each, as the convenience of the employer may require. . . . The corporation is equally chargeable, whether the negligence was in originally failing to provide, or in afterwards failing to keep its machinery in safe condition."

This language of the court in the Massachusetts case was quoted and approved by the supreme court of the United States in the case of *Hough v. Railway Co.*, 100 U. S., 213–219; and Mr. Justice HARLAN, who wrote the opinion in that case, says:

"A railroad corporation may be controlled by competent, watchful and prudent directors, who exercise the greatest caution in the selection of a superintendent or general manager, under whose supervision and orders its affairs and business in all its departments are conducted. The latter, in turn, may observe the same caution in the appointment of subordinates at the head of the several branches or departments of the company's service. But the obligation still remains to provide and maintain, in a suitable condition, the machinery and apparatus to be used by its employees — an obligation the more important, and the degree of diligence in its performance the greater, in proportion to the danger which may be encountered. Those at least in the organization who are invested with controlling or superior authority in that regard, represent its legal personality; their negligence, from which injury results, is the negligence of the corporation. The latter cannot, in respect of such matters, interpose between it and the servant who has been injured without fault on his part, the personal responsibility of the agent, who in exercising the master's authority has violated the duty he owes as well to the servant as to the corporation.

"To guard against misapplication of these principles, we

should say that the corporation is not to be held as guaranty-ing or warranting the absolute safety under all circumstances, or the perfection in all of its parts, of the machinery or appa-ratus which may be provided for the use of employees. Its duty, in that respect, to its employees is discharged when, *but only when, its agents, whose business it is to supply such instru-mentalities, exercise due care as well in their purchase origi-nally as in keeping and maintaining them in such condition as to be reasonably and adequately safe for use by employees.*"

In the same case the learned justice quoted the language of Mr. Wharton as follows: "At the same time we must remem-ber that when a master, personally or through his representa-tives, exercises *due care in the purchase or construction of buildings and machinery, and in their repair,* he cannot be made liable for injuries which arise from casualties against which such care would not protect. It is otherwise if there be a lack in such care *either by himself or his representatives.* The duty of repairing is his own, and, as we shall see hereafter, the better opinion is *that he is directly liable for the negligence of agents* when acting in this respect in his behalf. If the master knows, or in the exercise of due care might have known, that . . . his structures or engines were insufficient, either at the time of procuring them or at any subsequent time, he fails in his duty."

It seems to me that these authorities clearly establish the proposition above stated, that as to all machinery or appliances manufactured by the corporation and used by it there is a guaranty that such appliances so made and used are of sound materials, and that the workmanship is not faulty, and that if the materials are unsound or defective, or the workmanship is faulty, and an injury occurs to one of the employees by rea-son thereof, the company is liable to such employee for the damages resulting from such injury. In such case the bad materials are furnished and the faulty workmanship is done by the corporation itself. As to faulty workmanship there

can be no excuse, and it can only be excused in the use of bad materials where the defects in them are latent, and could not be discovered by proper examinations and tests.   Whether the same rule in its full extent would apply to the corporation where it purchased the machinery or appliance from some other party who is the maker, is, perhaps, a matter of some doubt upon the authorities.   But if the strict rule above stated is not applicable to the case of purchased machinery or appliances, and if in such cases the master is not, as to his employees, a guarantor of the soundness of the materials and the perfection of the workmanship, he is certainly liable for all imperfections in the materials or workmanship which could be discovered by a thorough inspection, and the application of the most approved and efficient tests.

Under the rules above stated as to the duty of the maker or purchaser of machinery to his employee, it will hardly admit of a doubt that the master ought to have ascertained so palpable and dangerous a defect as existed in this case.   At all events, the existence of such a defect would have been evidence of a want of due care on the part of the master, from which a jury might well have found negligence on the part of the master, either in making a proper inspection or in applying the proper tests.   But it is urged that a railroad company which receives a car from another company to transport over its road for a greater or less distance, is not under the same obligation to its employees to see that it is safe and perfect in all its parts.   And this was so held by the supreme court of Michigan in the case of *Smith v. Potter*, 9 N. W. Rep., 273; *S. C.*, 2 Am. & Eng. R. R. Cas., 140.   In that case, however, considerable stress was laid upon the fact that in the state of Michigan every railroad was bound by law "*to receive and forward cars of other roads impartially and diligently.*" The court held, among other things, that this law did not compel a railroad to receive or transport cars unfit for passage, or that the company required to receive the cars might not detain

them long enough to make a sufficient inspection of them in order to determine their fitness. It also held that the inspectors whose duty it was to inspect the cars which came on the road from other roads, were co-employees with the other employees of such road, and that for their negligence in not making a proper inspection of the cars so received, by reason whereof a defective car was received and a brakeman was injured thereby, the brakeman could not recover.

I know of no law in this state which compels one railroad company to receive and transport the cars of other roads over its line when requested to do so; but I am free to admit not only that such is the practice, but that, for the convenience of trade and commerce, it is a method of doing business which should receive the approval of the courts as absolutely necessary to the proper, cheap and speedy transaction of business over the roads of the country. The determination of the Michigan court that the inspectors of cars, whose duty it is to see that they are in proper repair, and when out of repair to see that proper repairs are made, are co-employees with the persons whose duty it is to use the machinery and other appliances furnished by the master, is not sustained by the authorities above cited; and that doctrine was expressly repudiated by this court in the case of *Shultz v. Railway Co., supra.* But if that were the doctrine, it would not affect the decision of this case, which arose under our statute which makes the company liable for an injury to one of its employees, when such injury is the result of the negligence of a co-employee.

If we admit that a less stringent rule as to care and diligence shall be required of the railroad company in respect to the cars which they receive from other companies and draw over their road for the mutual benefit of both companies and in the general interest of trade, a proposition which is perhaps doubtful under the authorities (see *Stetler v. Railway Co.,* 49 Wis., 609; *S. C.,* 46 Wis., 497–503; *Railroad Co. v. Barron,* 5 Wall., 90; *McElroy v. Railroad Corp.,* 4 Cush., 400; *Nel-*

*son v. Railroad Co.*, 26 Vt., 717; 2 Redfield on Railways, 302, 303; *Ill. Cent. R. R. Co. v. Kanouse*, 39 Ill., 272; *Schopman v. Railroad Corp.*, 9 Cush., 24), still such fact does not release the company from all obligation to protect its employees against the dangers resulting from imperfect machinery and appliances.  That duty still rests upon the company, and its duty in that respect must be performed with the utmost care and diligence consistent with the performance of its duty to the interests of trade and commerce.  If it be admitted that the necessities of business are such that the safety of life and limb of the employees of railroads must be put in some jeopardy as a sacrifice to such necessities, certainly the lives of the employees are not to be unnecessarily sacrificed to such interests.  It seems to me that the companies should be held to the exercise of all the care and diligence to protect its employees from the defects of cars coming on their tracks, which is consistent with the necessities of business.  As was said by the Michigan court, although the statute requires one company to receive and transport cars which are offered to them for that purpose, still it is not required to receive or transport cars which are unfit to be used, or threaten danger or death to its employees.

There was certainly a duty imposed upon the defendant company to exercise some degree of care to prevent the transportation over its line of road of any cars or appliances of other companies which were so defective in their construction, or which had become so defective by use, as to be unfit for further use, and which, on account thereof, endangered the lives or limbs of its employees.  There is also a well defined rule that the care required of the company is, in some degree, measured by the consequences which are likely to result from a defect in any part of the machines or appliances in use by its employees.  If no evil results are likely to fall upon the employee from a defective piece of machinery or other thing in use by the company, or if such results would not follow ordi-

narily by their use, it is plain that the degree of care required of the company would not be the same as though very serious injuries were likely to follow therefrom.

In the case at bar, a defective ladder placed, as the one in question was, at the end of the car, was one of the most dangerous appliances the company could possibly furnish its employees. It is well known that the employee is frequently required, in the discharge of his duty, either to ascend or descend such ladder while the car to which it is attached is in motion. Any defect therein which would throw the employee therefrom while so using it, would be likely to result in his death, or some very great bodily injury. The result of the defect in this case is one which would be likely to happen in every case where a like defect existed. The plaintiff made clear proof of the defect which caused the death of the deceased. The defect was of such a character as would clearly charge the owner with knowledge thereof if the ladder had been constructed by the owner or its employees, or if the defect had been caused by the repair of such ladder after it had been made. If the owner of the car had purchased it ready-made, and the defect of the ladder had been in its original construction, such owner would also be chargeable with knowledge of such defect, if it could have been discovered by proper tests and inspection; and if, while in use by such purchaser, the defect in the ladder had resulted from the carelessness of its employees in repairing the same, then such purchaser would have been charged with a knowledge of the defect absolutely, in like manner as though the defect had been in the original construction and the owner was the constructor. Had the defendant company been the owner of the car to which the defective ladder was attached, I think it quite clear that the evidence produced by the plaintiff would have been ample, unexplained and uncontradicted, to have entitled her to have the question of the negligence of the defendant submitted to the jury; and I do not understand that my brethren differ with me in opinion upon that point.

Does this evidence tend to prove the defendant company guilty of negligence? My brethren hold that it does not, because it appears that it was not the owner of the car, but had received it from another company for transportation over its road. With all proper respect for the opinion of my brethren, I am unable to agree to this proposition. It may be true that, as between the company receiving cars for transportation and the company furnishing them, the company receiving the same may rely upon the presumption that the cars are fit for use, and that the furnishing company has made such tests and inspection thereof as would show their fitness for such use. And possibly, as between the two companies, the receiving company is not bound to make any inspection thereof before using them, in order to charge the furnishing company with any damages which might result from that use by reason of any defects existing at the time they were received. There is, no doubt, an implied warranty on the part of the furnishing company that the cars are reasonably fit for use, and, unless the defect be plainly visible, there is, as between these parties, no duty on the part of the receiving company to make any particular examination for defects; and if injury results from the use of the cars from defects which ought to have been known to the furnishing company, such company would, undoubtedly, be liable to make good the damages.

This rule as to the duty of the receiving company, as between itself and the furnishing company, is not in my opinion the rule as to the duty of the receiving company to its employees. The fact that the car is not its own does not relieve the company using it from its general obligation not to subject its employees to unnecessary danger by the use of imperfect or defective machinery or appliances. This obligation is continuous and universal, and it cannot relieve itself of such obligation by pleading that it was not the owner of the car or machinery, and that the owner had warranted its perfection and fitness for use, and that it relied on such warranty. If that rule should be adopted in a case of this kind, there does not seem

to be any good reason why the company might not in like manner relieve itself from liability to its employees for defects in any machinery which it had bought from any person or corporation, with a like implied warranty as to its sufficiency, without showing any tests or inspection in order to ascertain its sufficiency.

It seems to me that the liability of the company as to its employees is the same whether the company has purchased the defective machinery or cars, or whether it has received them for use upon its road from another company. There certainly can be no doubt upon this point as to such machines or cars as the company lease from the owner for a definite term, and use upon their road. In cases like the one at bar, the receiving company takes the car and transports it for its own benefit, and only incidentally for the benefit of the furnishing company. It would seem that in such case the cars transported, as between the company transporting them and its employees, should be treated as the cars of such company. While in use, the receiving company has the absolute control of the same — as much so as of any car owned by the company. Any negligence which can be imputed to the purchaser of a car, as between itself and its employees, in not purchasing perfect and suitable cars for use, must be imputed to the company which receives upon its road for transportation the cars of another company. If the convenience of business prevents the receiving company from making such inspection and tests of the cars received as are usually made and required of a company purchasing or leasing cars for its permanent use, and it is compelled to rely upon the vigilance of the company from which the cars are received to detect imperfections therein, then, as between itself and its employees, the want of vigilance on the part of the company purchasing the cars must, as between the company using the same and its employees, be imputed to the company using them, and such employee may recover damages for any injury resulting to him

from a defect in such car which ought to have been discovered by the company furnishing them, either from the master in whose use the car was at the time of the injury, or from the owner of the car.

There is, perhaps, some analogy between a case of this kind and that of a city or other municipality which permits a citizen to make excavations or do other acts in its public streets which are dangerous to the public. In such cases, if the citizen doing the work in the street does it in a careless manner, so as to endanger the safety of the traveler, and injury occurs to the traveler by reason of such neglect, the neglect of the person doing the work in the street is imputed to the municipality, and the party injured may have his action for the injury against the municipality, or against the person whose negligent acts caused the injury. The cars of one company used by another on its road, and which cars it is the duty of the employees of the company using the same to handle, manage and care for, the same as other cars owned by the company, must be treated for the time being as the cars of the company using them, and the company so using them should be held to the same responsibility to its employees for their safety as though it was the owner of them. No other rule will furnish any protection to its employees, and, if not enforced, then as to cars transported by the company over its line not owned by it, its employees will be subjected to the risk of life and limb from defects which show criminal negligence on the part of the owners of the cars, without remedy, unless they seek it from the corporations owning them.

Every person who has observed a passing freight train on one of our great railroads, knows that it is, as a general rule, made up of cars owned by several independent railroad companies; and many trains will be made up of cars owned by railroad companies located in distant states. Shall the employee, whose duty to his employer requires him to care for and manage all these cars in like manner, when injured by a defect

which ought to have been known to the company owning the same, be told that he must seek his remedy of that company, located in New England, New York, or some other state so far from his locality as to render his remedy almost hopeless of any beneficial results? Or shall he be permitted to say to his employer: "These cars are transported by you for your exclusive benefit, so far as they pass over your road. You have employed me to care for and manage alike all cars which you choose to transport; and under the general and well-established rules of law you are bound to see to it that you do not endanger my life or limbs unnecessarily by the use of cars which, by reason of imperfections, are dangerous?" It seems to me that there should be but one rule as to all cars used. The company, for the time being, and while the cars are in use by it, should, as between it and its employees, be deemed the owner thereof.

The fact that in this case the company owning the car and the company using it are both located in this state, and the fact that the company using the car transported it but a few miles, can have no effect in changing the liability of the company using and transporting the same. If the defendant company be not liable for the defect in this car, then it would not be liable though the car were owned by some New England corporation, and though it had been transported over its line from. Chicago to Omaha or Dakota. It seems to me that justice to the employee requires that the company using a car and transporting it over its road must be held to the same liability, as between itself and its employee, as though it owned the same, and had acquired its title by purchase; and that, as between itself and its employees, it must be held responsible for all defects which it would be liable for had it been the owner by purchase. Any less degree of responsibility will furnish no protection to the employee against the use by his employer of the most dangerous cars, engines and other appliances. This rule will work no injustice to the railroads. It is for their conven-

ience that an interchange of cars should be made, as well as for the convenience of the public and the rapid transaction of business; and if, as suggested above, it is impracticable to make a thorough inspection of cars at every transfer from one company to another, still the owning company sending out its cars guaranties to all other companies receiving them that they are reasonably fit for use, and if they are not, and any damage occurs to the company or companies receiving and transporting them, either directly by an injury to their railroad cars or other property, or indirectly by an injury to its employees, for which it is compelled to make compensation, such receiving company can recover over against the company owning the cars and furnishing them for transportation.   Any other rule than the one suggested leaves the employee entirely remediless against his employer, as the result reached by the decision in this case shows. .

The circuit court nonsuited the plaintiff, although she showed that her husband had been killed by a defect, either in the original construction of the ladder to the car or in its subsequent repair, so gross in its character as showed criminal carelessness on the part of the maker or repairer.  This nonsuit can only be sustained on the theory that the defendant using this car was bound to make no inspection or tests which would have discovered the defect; that to make the defendant using the car liable for a defect in its construction or repair, the defect must be such that it is apparent to the casual observer by looking at the same.   This rule comes very near excusing the defendant altogether.  It requires the injured party to show affirmatively, either that some responsible officer, agent or employee of the company, whose duty it was to see that its cars were kept in repair, knew of the defect before the accident happened, or that he might have known it by the sense of sight, without any other aid, and without any test of any kind. This rule relieves the company from liability for any defects not visible.   It imposes no duty on the company to make ex-

Ballou, Adm'x, vs. The Chicago, Milwaukee & St. Paul R'y Co.

amination for any defects not visible. And, as in the case of defects which were so palpable as to be readily apparent to the casual observer, it would be quite difficult for the employee to recover for an injury resulting therefrom, the result of the ruling of the court in this case will be, that no recovery can be had in any similar case unless the employee could prove that some responsible employee of the company had in fact made an examination, which he was not bound by any rule of law to make, and so had discovered the defect before the accident happened.

The rule laid down by the supreme court of the United States in the case of the *Pennsylvania Co. v. Roy*, 102 U. S., 451, as to the liability of a railroad company to its passengers for injuries received by reason of the defective construction of a car constituting a part of the train, not owned by them and for the use of which the passenger pays another company a separate charge, is, I think, strictly applicable to the liability of the company to its employee for an injury received by reason of a defective car owned by another company, but transported and used for the time being by the master company, and in regard to which car the duties of the employee are the same as if such company owned the same: "The only distinction is in the degree of care which the company is bound to exercise in the two cases. In its relation to the passenger, the company is bound to exercise the utmost caution characteristic of very careful judgment, and is responsible for injuries resulting to a passenger which might have been avoided by extraordinary vigilance, aided by the highest skill."

In its relations to its employees, the company is bound to exercise a less degree of care and skill in furnishing and keeping in repair its cars and machinery for the use of its employees; and the least degree of care and skill required is such as an ordinarily careful and skillful man would use under like circumstances. And the degree of care and skill required, as

Ballou, Adm'x, vs. The Chicago, Milwaukee & St. Paul R'y Co.

above remarked, is modified by the dangerous consequences which are likely to result to its employees from the use of the particular machine or appliance, if defective or imperfect. In the opinion in the case above referred to, the court, after stating the strictness of the obligation of the carrier to protect him against any damage, says: "These doctrines, to which the courts, with few exceptions, have given a firm and steady support, and which it is neither wise nor just to disturb or question, would, however, lose much, if not all, their practical value, if carriers are permitted to escape responsibility upon the ground that the cars or vehicles used by them, and from whose insufficiency injury has resulted to the passenger, belong to others. . . . The duty of the railroad company was to convey the passenger over its line. In performing that duty it could not, consistently with the law and obligations arising out of the nature of its business, use cars or vehicles whose inadequacy or insufficiency for safe conveyance was discoverable upon the most careful and thorough examination. If it chose to make no such examination, or cause it to be made — if it elected to reserve or exercise no such control or right of inspection from time to time, of the sleeping cars which it used in conveying passengers, as it should exercise over its own cars,— it is chargeable with negligence or failure of duty. . . . The law will not permit a railroad company engaged in the business of carrying persons for hire, through any device or arrangement with a sleeping-car company whose cars are used by, and constitute a part of, the train of the railroad company, to throw off the duty of providing means for the safe conveyance of those whom it agrees to convey."

This language is strictly applicable to the duty of the company to its employees, except as to the degree of care and skill to be used in the selection and maintenance of suitable and safe cars, engines, machinery and appliances for the use of its employees. The duty of the employee being to look after, use and manage all cars in use upon his employer's road, the

duty of the employer should be the same in respect to all such cars, no matter by whom owned, to see that they are in a reasonably safe condition for use upon its road; and the reasons for holding the company to such liability to its employees is full as strong as the reason for holding it responsible to its passengers under like circumstances.

If it be admitted that the defendant company in this case was charged with any duty, as between itself and its employee, to see that the ladder which caused the injury was in a reasonably safe condition for his use at the time the accident happened, then it appears to me it was error to nonsuit the plaintiff upon the evidence produced by him. If it be said that the defect was, in some sense, a secret defect, still it was not such a defect as might not have been easily discovered by tests and examinations; and, in the absence of all proof that the company had made any examination or tests for the purpose of discovering the defect, it presented a question of fact for the jury to determine whether reasonable inspection or tests would have discovered it, and not a question of law for the court.

The plaintiff having shown gross carelessness either in the construction or in the repair of the ladder, the evidence tended to prove carelessness on the part of the company. If it was charged with any care in regard to the car at all, it would seem that, in order to exonerate itself, it should have shown that no inspection or tests which are made by railroad companies, of its cars and their appliances, would have discovered the defect; or, at least, it should have shown that it made such inspection and tests, by competent men, as are made by railroad companies generally, and that the defect was not discovered. It is certainly a question of fact, and not of law, whether a proper inspection or test of the ladder would have discovered the defect therein; yet the learned circuit judge determined, as a question of law, that no proper inspection or test would have discovered such defect. How can the learned circuit judge, or the judges of this court, know that a proper in-

spection and test would not have discovered the defect? I think it quite probable that neither would have been competent, as a witness, to have expressed an opinion as an expert as to what would be a proper inspection of the car and its appliances, or whether such proper inspection would have been likely to have discovered the defect in question. How, then, can we say that no reasonable inspection or tests would have discovered this defect? And yet that is what was said by the learned circuit judge, without any proof to enlighten him upon that subject.

It is, I think, apparent that the ruling of the learned circuit judge can only be upheld by holding that as to this car, not owned by the defendant, it owed no duty to its employee to see that it was in a safe condition for use upon its road; that, as is said in the opinion of the court in this case, the defendant company had the right to presume that proper inspection and tests had been made by the company owning the car, and from which the defendant received it, and that consequently there was no duty of inspection or tests imposed upon the defendant. I cannot bring myself to that conclusion. I think the law is and should be otherwise. If a railroad company receives upon its road, for transportation, the cars of another road, and requires its employees to look after and care for them, the same as it does as to its own, the obligation to see that they are reasonably safe for use rests upon the company the same as though it was the owner. As I have said above, no other rule will be just, or furnish any protection to the employee.

The assumption in this case that reasonable care on the part of the defendant company would not have discovered the defect which caused the injury, is the assumption of a fact not proved in the case, and to support which there is no evidence. The other assumption, that there was any duty imposed on the brakeman to make inspection of the car or ladder to see whether it was fit or safe for use, is an assumption based upon

no proof, and is in no sense a question of law, except so far as the law might charge the brakeman with knowledge of a plain and visible defect, and defeat a recovery because the defect was so plain and visible that he could not but have known of its existence, and consequently took the risk of using that which was clearly dangerous to use. The effect of the decision in this case must be, I think, to discharge the railroad company from any care or diligence in furnishing safe or suitable cars, machines or appliances for the use of its employees, in all cases where the company is not the owner of them, no matter what the defect in the construction or repairs made upon the same, unless such defect is patent to the most casual observer; and where it is so patent, it is probable the employee could not recover, because he would be equally chargeable with notice of the defect as the company. To such a doctrine of responsibility of the master to his employee I cannot assent.

In my opinion the circuit judge erred in taking the case from the jury and directing a nonsuit, and for that reason the judgment ought to be reversed.

*By the Court.*— Judgment affirmed.