THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY
v. ISAAC J. LEDBETTER.

NEGLIGENCE; *Burden of Proof; No Cause of Action Proved.* In an action
by a yard switchman against a railroad company in whose employ he had
been, for injuries alleged to have resulted in consequence of a defect in
the draw-bar of a car, or in some of its accompanying appliances, *held*,
that no recovery can be had against the railroad company except by
proof of negligence on its part, and that it devolves upon the plaintiff
to prove the negligence and to prove all the facts which constitute or
make apparent such negligence; and therefore, where it was not shown
that the railroad company had any knowledge of the defect existing in
the draw-bar, or in some of its accompanying appliances, prior to or at
the time of the injury, or that such defect had existed for any consid-
erable length of time; nor what was the nature or character of the
defect, that it was obvious or manifest, or could have been discovered by
the exercise of reasonable care and diligence or by any of the tests em-
ployed by car inspectors; nor that the car had not been properly inspected
by the car inspectors at the yard where the injury is alleged to have
occurred, *held*, that no negligence is shown on the part of the railroad
company, and that no cause of action against the railroad company has
been proved.

## Error from Wyandotte District Court.

ACTION brought on May 31, 1883, by *Isaac J. Ledbetter*
against *The Atchison, Topeka & Santa Fé Railroad Company*,
to recover damages for personal injuries alleged to have been
received by the plaintiff while in the employment of the de-
fendant at Emporia, Kansas, on November 12, 1881. The
plaintiff's cause of action is stated in his petition as follows:

"That the plaintiff was, on the 12th day of November, 1881,
and had been for a long time prior thereto, in the employment
of said defendant as a switchman, or yardman; that on the day
aforesaid, the said plaintiff, while in the due and ordinary
discharge of his duty as such switchman or yardman, and
while attempting to couple a moving engine onto a stock car
—then standing upon the track of defendant in the yard of
said defendant at Emporia Junction, in the county of Lyon,
in the state of Kansas—was severely and permanently in-
jured; that the said injury was wholly caused by the defective
and bad condition of said stock car; that the defendant neg-

ligently failed to inspect and ascertain its defective and bad condition prior to that time, and that it had a reasonable opportunity so to do; that the defendant knew that the said stock car was in a defective and bad condition prior to that time, and that it had reasonable opportunity for so knowing; that at the time of the said injury the plaintiff was in the exercise of ordinary care; that the defendant negligently failed to give warning or information to the plaintiff that the said stock car was in a defective and bad condition, and that the plaintiff had no knowledge of its defective and bad condition, or opportunity to ascertain the same."

The plaintiff claimed judgment for $10,000. The answer of the defendant was a general denial. On July 24 to July 29, 1884, a trial was had before the court and a jury, which trial resulted in a verdict and judgment in favor of the plaintiff and against the defendant for $5,000 and costs. The jury also made special findings of fact. The defendant moved for a new trial upon various grounds, which motion was overruled by the court. On December 4, 1884, the defendant brought the case to this court for review.

*James Hagerman, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error; *Geo. W. McCrary,* general counsel.

*Thomas P. Fenlon, Joseph S. Ensminger,* and *Waters & Chase,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: The principal facts brought into this case by the parties, and upon which the plaintiff's cause of action is to be sustained or defeated, are substantially as follows: During the month of November, 1881, and prior thereto, the plaintiff, Isaac J. Ledbetter, was in the employment of the defendant, the Atchison, Topeka & Santa Fé Railroad Company, as a yard switchman at Emporia, Kansas. At that point the defendant had two yards, one at the junction of the M. K. & T. Railway with the Atchison, Topeka & Santa Fé Railroad, and called the "upper yard," and the other about one mile west from there, and called the "lower yard." There

were three car inspectors at these yards, two of whom were to perform their duties in the day-time and the other to perform his duties in the night-time, and their principal duties were to inspect cars as they were brought into the yards from other places, and if a car was found to be in such condition as to be unfit for use, to mark it "Bad order" and have it placed on the repair track for repairs or sent to the general repair shops at Topeka for such purpose.   It was also the duty of the yard switchmen to inform the car inspectors of any defects or imperfections which they might discover in any of the cars while performing their work.   There was also a physician and surgeon residing at Emporia, near these yards, who was employed by the defendant railroad company to attend professionally to any of the defendant's employés who might become disabled or injured while in the defendant's service, free to the employés and at the defendant's expense.

The defendant also had car repairers and many other employés at those two yards.   In the afternoon of November 11, 1881, the plaintiff coupled the switch engine to the west end of a Vandalia stock car, which was then standing on a track in the lower yard and contained sheep, and the engine and car were then taken to the stock chute in the upper yard, and there the brakes of the car were set and the car left to be unloaded.   On the next morning, November 12, 1881, the plaintiff coupled the same engine to the same end of the same car, the car at the time standing at the same place and in the same condition at which and in which it was left the day before. The car was then removed and placed on a side track.   The engine was then taken around to the other end of the car and was backed toward the car, the tender being between the engine and the car, and the plaintiff stood on the foot-board of the tender, and when the tender came near the car he proceeded to couple them together.   When the draw-bar, or draft-iron as it is sometimes called, of the tender struck the draw-bar or draft-iron of the car, the draw-bar of the car was pushed under the dead-wood of such car, without shock, collision or stroke, and the plaintiff was caught sidewise about the hips,

between the dead-wood of the car and the iron band beneath the draw-bar of the tender, and was pressed or squeezed in such a manner as to cause the injuries complained of. He probably received some slight injuries, but no bones were broken or fractured. The car was not marked out of order or in bad order, or in any other manner, and there is no evidence that it was out of order, except the foregoing facts; and what was out of order, defective or imperfect, if there were any defects or imperfections, no one knows, except from the foregoing facts.

The plaintiff said nothing at the time about being squeezed, or hurt, or the car being out of order, and the engineer, fireman and foreman of the yard gang, who were present at the time, had no knowledge of the same. The plaintiff then got off the foot-board of the tender and sat down upon the side-track near by for a few minutes, and then got on the foot-board of the tender again and rode from that place down toward the lower yard to Commercial street, in the city of Emporia, where he left the engine, tender and car with the engineer, fireman and foreman, who accompanied him from the upper yard, and walked to his home in Emporia, a distance of three or four blocks. What was afterward done with the car is not shown. When the plaintiff arrived at his home, he lay down until dinner. He examined his person and found some bruises upon his hips. He got up and ate his dinner, and then lay down again until three o'clock in the afternoon, when he went back to the yards and worked till night. He worked the rest of the month of November for the defendant, and all the month of December, except the period between Christmas and New Year, when he was given a vacation, and all the month of January, and quit work for the defendant in February, and went back to his old home in the state of Illinois. Afterward he returned to Kansas, and, after working for two or three different railroad companies, commenced again on September 17, 1882, to work for the defendant, at Emporia, and afterward worked for the defendant at Argentine, commencing about December 20, 1882. He worked for

the defendant at this place until about April 17, 1883, when he quit work on account of sickness. His sickness was of a malarial character, and he was treated by his physician for malaria and was benefited. Malarial complaints are common at Argentine, and the plaintiff had suffered from such complaints prior to his coming to Kansas. In May he went to work again for the defendant, but soon quit, and, on May 31, 1883, commenced this action.

The plaintiff testified that during all the time from the time when he received the injury at Emporia, on November 12, 1881, down to the time of the trial, he had suffered from the effects of such injury, and that he was often sick and unable to work. But at no time did he consult a physician with regard to such injury, and he was at no time treated by any physician for such injury; but the treatment that he received from the various physicians who at various times prescribed for him was all for malaria, bronchitis, and loss of voice. He did not at any time consult the defendant's physician and surgeon at Emporia. He did not mention the injury to the engineer or fireman who had charge of the switch engine which was used at the time of the injury, nor to his foreman, nor to any other one of the company's employés at Emporia. In his testimony he stated that he mentioned the matter to his foreman, but the jury found against him on this subject. He did not inform the car repairer at Emporia, or make any report that anything was wrong or out of order with regard to the Vandalia stock car, from which he states he received the injury, although it was his duty to do so, if in fact the car was out of order. He did not in fact at that time, nor for many months afterward, inform any employé, agent or officer of the defendant that there was anything wrong concerning such stock car, or that he had received any injury therefrom. He made no claim upon the defendant or any of its officers or agents for damages for the alleged injury, until sometime in August, 1882, about nine months after the injury is alleged to have occurred. And neither the engineer of the switch engine which was used in making the coupling at the time when the

plaintiff is alleged to have been injured, nor any other available witness, ever heard of the injury until many months after the injury is alleged to have occurred. The plaintiff testified that something was wrong or broken about the draw-bar of the car, but he did not know what it was, did not examine to see what it was, and made no effort to ascertain what it was. Indeed, he did not carefully examine the car for any purpose. On the day that the injury is alleged to have occurred he saw only the two ends and one side of the car to know whether it was even marked "Out of order," or "In bad order," or not.

The jury rendered a verdict in favor of the plaintiff and against the defendant for $5,000. The defendant then moved for a new trial upon various grounds, among which was the ground "that the said verdict is not sustained by sufficient evidence, and is contrary to law." The court overruled the motion for a new trial, and rendered judgment upon the verdict in favor of the plaintiff and against the defendant for $5,000 and costs. The defendant now seeks to have this judgment reversed.

In the examination of the questions involved in this case, we shall assume that the draw-bar of the Vandalia stock car, or something connected therewith, was out of order; but in what the defects or imperfections consisted, or what was their nature or character, no one can tell nor even imagine, unless he wanders into the uncertain regions of conjecture and speculation. This indefiniteness and uncertainty, however, can probably make but little difference, if the defects or imperfections themselves can be traced with reasonable directness and certainty to the negligence of the railroad company. We shall also assume that the plaintiff received injury by reason of the imperfect action of the draw-bar and its accompanying appliances. But this assumption is also open to criticism and to doubts and uncertainties. But assuming that the draw-bar for some reason failed to operate as it should, and that the plaintiff was injured in consequence thereof: do these things make out a cause of action in favor of the plaintiff and against the defendant? We think not. A railroad company is not

an insurer of the perfection of any of its machinery, appliances or instrumentalities used in the operation of its railroad, but is required only to exercise reasonable and ordinary care and diligence to see that all these things are in a reasonably safe condition. In other words, the railroad company is liable to its employés in such cases for negligence only; and this negligence must be shown by the party who asserts the same. The plaintiff claims that the railroad company was guilty of negligence in not having the said Vandalia stock car inspected prior to the time of his attempt to couple the same to the tender; but there is not a particle of evidence tending to show that the car was not inspected prior to that time. It may have been inspected at the lower yard, and it may also have been inspected at the upper yard. The fact that the draw-bar or some of its accompanying appliances were out of order does not prove that the car was not inspected. There was no showing that the defect, whatever it may have been, was obvious or manifest. It may have been latent, hidden and concealed, undiscoverable by the exercise of ordinary care and diligence, undiscoverable even by any possible inspection which the yard inspectors could have resorted to. The draw-bar was in its place. The spring may also have been in its place. So may also all the accompanying appliances. All may have appeared to be in perfect condition, and yet may not have been in such condition. If the draw-bar had been obviously out of place, of course the railroad company should have known it. But so also should the plaintiff have known it; and he would have been negligent if he had not known it and had attempted to make the coupling in the manner in which he did. All persons are bound to use their senses. But the draw-bar was not out of place. It was just where it should have been. It is possible, however, that the spring which keeps the draw-bar in its place may have become partially broken or otherwise out of order, and yet the defect may not have been so obvious as to be discoverable by any possible test which the yard inspectors could have made. The spring may have been strong enough to withstand all their

tests, and yet so weak as to be wholly broken or displaced when subjected to the great pressure of the ponderous locomotive engine. The tests made by the car inspectors at stations cannot of course be so thorough and exhaustive as the tests made at the general construction shops or repair shops. A test made by the car inspectors is at best only cursory, and is generally made in less than five minutes' time. There is no evidence as to when the defect in the present case originated. It may have been of long standing, but probably was of very recent origin. No examination was made of the draw-bar, or the spring, or anything else, to see when it apparently originated. It may have originated that morning, by reason of the great pressure of the engine. We shall assume, however, that it originated before that time, but that it was not apparent upon an ordinary inspection by car inspectors. In Wisconsin it has been held as follows:

"One railroad company receiving a loaded car from another, and running it upon its own road, is not bound to repeat the tests which are proper to be used in the original construction of such a car, but may assume that all parts of the car which *appear* to be in good condition, are so in fact." (*Ballou v. C. M. & St. P. Rly. Co.*, 54 Wis. 257; same case, 11 N. W. Rep. 559; same case, 5 Am. & Eng. Rld. Cases, 480.)

All the authorities hold that a railroad company in a case like the present is liable only for negligence, and that it devolves upon the plaintiff to show the negligence; or, in other words, that it devolves upon the plaintiff to prove all the facts which constitute or make apparent the alleged negligence. In the present case the plaintiff has failed to make any such showing. He has not shown, nor was it shown, that the railroad company had any knowledge of the defect existing in the draw-bar, or in some of its accompanying appliances, prior to or at the time of the injury, or that such defect had existed for any considerable length of time; nor what was the nature or character of the defect, that it was obvious or manifest, or could have been discovered by the exercise of reasonable care and

*Negligence charged; burden of proof; no cause of action proved.*

diligence, or by any of the ordinary tests employed by car inspectors; nor that the car had not been properly inspected by the car inspectors at one or both of the yards at Emporia; and not showing any of these things, we think the plaintiff has failed to show negligence on the part of the railroad company, failed to show a cause of action against the railroad company, and therefore he is not entitled to recover upon his present presentation of this case.

In support of the propositions enunciated in this case, we would refer to the following cases: *The A. T. & S. F. Rld. Co. v. Wagner*, 33 Kas. 660, and the numerous authorities there cited. See also *Case v. C. R. I. & P. Rld. Co.*, 21 N. W. Rep. 30; same case, 19 Am. & Eng. Rld. Cases, 142; *Disher v. N. Y. C. & H. R. Rld. Co.*, 15 Am. & Eng. Rld. Cases, 233.

The judgment of the court below will be reversed, and the cause remanded for a new trial.

All the Justices concurring.