The St. Louis & San Francisco Railway Company
v. John W. Weaver.

1. CASE—*Removal to Federal Court.* A case cannot be removed from a state court to the federal courts under the act of congress of March 3, 1875, after a hearing has been had in the state court on a demurrer to the complaint because it does not state facts sufficient to constitute a cause of action.

2. CONTRIBUTORY NEGLIGENCE; *Finding, Sustained.* The jury found as a fact that the plaintiff was not guilty of contributory negligence. *Held,* That the supreme court cannot say from the evidence and as a matter of law that the finding of the jury is erroneous.

3. ——— *Burden of Proof.* The burden of proving contributory negligence on the part of the plaintiff rests upon the defendant.

4. NEGLIGENCE; *Finding, Sustained.* The jury found as a fact, that the defendant was guilty of negligence in two or more particulars, causing the injuries complained of. *Held,* That the supreme court cannot, under the evidence and as a matter of law, say that the finding of the jury is erroneous.

5. SECTION BOSS AND ENGINEER, *Not Coëmployés.* A section foreman or section boss in the employment of a railroad company is not a coëmployé or fellow-servant with an engineer having charge of a locomotive engine drawing a railroad train, within the meaning of that rule of the common law which exempts the master from liability for negligence between coëmployés or fellow-servants.

6. COMMON LAW, *Judicial Notice of.* The courts of this state may take judicial notice of the common law of Kansas, and what it would be except for our own statutes and our own written law; and for this purpose the courts of this state may take judicial notice of all the judicial decisions in this country and in all other countries which

have adopted the common law of England; but for the purpose that the courts of this state shall know as a fact in a particular case what the common law of some other state is, such law must be proved as any other fact.

7. COMMON LAW, *When to Govern; Presumption.* Where a cause of action involves as a question of fact what the common law of some other state is, it will be held that the common law of such other state is the same as that of Kansas, unless it is shown by the evidence to be otherwise; and when it is shown by the evidence to be otherwise, it will govern as it is thus shown to be.

8. MASTER — *When Liable, When Not.* The question as to when a master at common law is liable and when not liable for negligence between coëmployés, discussed.

9. EVIDENCE — *Conversation between Civil Engineer and Roadmaster.* Where the chief civil engineer, having charge of the construction and repairs of a railroad, and the division roadmaster, having charge of a division of the road for the purpose of keeping it in proper condition and repair, have a conversation with regard to the condition and safety of a particular portion of the road within that division, the declarations of the chief civil engineer made in such conversation may be given in evidence as against the railroad company, for the purpose of showing that the railroad company had notice of the dangerous condition of a particular portion of the road within that division.

10. IMPEACHMENT *of Party's Own Witness.* The question as to whether a party may impeach his own witness is largely within the sound judicial discretion of the trial court; and although the court may have committed slight error in the present case in permitting such an impeachment, yet under the circumstances of the case the supreme court cannot say that any material error was committed.

11. REPAIRS AFTER ACCIDENT, *as Evidence.* The injuries complained of were caused by the alleged incapacity of a passage-way for water, and the court permitted the plaintiff to introduce evidence to prove that the defendant, after the accident occurred, enlarged the capacity of such water-way. *Held,* That this evidence did not of itself prove negligence, nor that the defendant had notice of the insufficiency of the water-way prior to the accident, nor that it might have had such notice by the exercise of reasonable diligence, nor that it did not exercise such diligence; but at most, it only tended to prove, by way of admission on the part of the defendant, that the water-way was originally too small; and the introduction of such evidence for this purpose was not erroneous.

12. RAILROAD COMPANY, *to Keep Track and Roadway Safe.* The law does not require that a railroad company shall, as between it and its employés, guarantee the sufficiency, good order and good condition of

its tracks and roadway, but merely requires that the railroad company shall exercise reasonable and ordinary care and diligence to keep its tracks and roadway in a reasonably safe condition; and *held*, that the present case was tried upon such theory of the law.

13. ———— *Company to Make Road Safe.* A railroad company, as between it and its employés, must exercise reasonable and ordinary care and diligence to make its road safe, whether it originally constructed the road, or purchased it, or leased the same.

### Error from Harvey District Court.

ACTION brought by *John W. Weaver* against *The St. Louis & San Francisco Railway Company*, to recover damages for personal injuries. Trial at the January Term, 1885, when the jury found for the plaintiff, and assessed his damages at $10,-000. In answer to special questions submitted to them, at the request of defendant, the jury made special findings of fact, as follows:

"1. What caused the plaintiff's injuries complained of in his petition? A. Wreck.

"2. If you find that he was injured by a wreck on the defendant's road, state the cause of the wreck. A. Wash-out.

"3. If caused by a storm, state the nature thereof; whether it was of an unusual, violent and unprecedented character? A. An unusual rain, but not unprecedented.

"4. State whether or not a water-spout or tornado occurred that night in the valley above where the wreck occurred? A. No.

"5. Was the plaintiff injured as the result of his own negligence, or of the defendant's negligence; or was it the result of both his negligence and that of the defendant? A. Defendant's.

"6. If you find that it was the result of the defendant's negligence, state in what the negligence consisted. A. Improper construction of water-ways, and negligence on part of section foreman.

"7. If you find that an unusual storm occurred in the valley above the wreck that night, did plaintiff know or have reason to believe, before he reached the place where the wreck occurred, that such storm had prevailed? A. No.

"8. By what corporation or company was this railroad constructed? A. St. Louis, Arkansas & Texas.

"9. Did the company which constructed the road at the

place where plaintiff was injured, use due care and diligence in the construction of the same? A. No.

"10. Who was the chief engineer and person who had charge of the construction of the road at the place where the accident occurred? A. Dun.

"11. Was the chief engineer who had charge of the construction of said road a skillful, competent and prudent man for the work in which he engaged? A. Yes, but liable to mistakes.

"12. If you find that the road was not properly constructed, state in what particular. A. Insufficient water-ways.

"13. Were the water-ways and water-gaps which were placed in the road at the time of its construction of sufficient capacity to carry off the water that fell in an ordinary and usual storm in that country? A. Yes.

"14. Was the road properly constructed at the place where the wreck occurred? A. No.

"15. If you find that it was not properly constructed, state in what particular it was defectively constructed? A. Insufficient water-ways.

"16. State whether or not the water-ways and water-gaps were of sufficient capacity to carry off all the water which the company had reasonable ground to believe would fall in that valley during any storm likely to occur? A. No.

"17. Did the men engaged in the construction of the road at the place of the accident exercise the highest practical diligence which capable and faithful railroad men would exercise under similar circumstances? A. No.

"18. If you find they did not, in what did their failure consist? A. In not providing a sufficient water-way.

"19. From the time of Downing's employment to the time of the accident complained of, had the defendant company, or any of its officers, reason to believe that Downing was incompetent, unskillful, or unfit for the position which he held? A. No.

"20. Did the defendant, at the time it employed J. R. Ward as division roadmaster, and up to the time of the accident, have reason to believe that he, Ward, was a competent, skillful and capable man for the position which he filled? A. Yes.

"21. Was Samuel Lyman, at the time he was employed by the defendant company as general roadmaster, a competent, capable and skillful man for the position of general roadmaster? A. Yes.

"22. Was the defendant company or any of its agents or employés guilty of negligence in the construction or maintenance of its road at the place of the wreck? A. Yes.

"23. If you find that they were, what officers or servants were they, and in what did the negligence consist? A. Chief engineer; improper construction of the water-ways.

"24. If you find that the road was imperfectly constructed, state whether the attention of the company, or its officers, or employés, was called or directed to the imperfect construction? A. Yes.

"25. At what rate of speed was the plaintiff running his train when it came around the curve in sight of the point where the wreck occurred? A. Twelve to fourteen miles per hour.

"26. Was the plaintiff, at the time of the wreck, running his engine at a greater rate of speed than fourteen miles per hour? A. No.

"27. If you find that the plaintiff's injuries were caused by the negligent act of the defendant, state specifically in what that act consisted? A. Improper construction of water-way, and failure of the section foreman to warn the train-men of danger.

"28. Was Charles Downing and the plaintiff engaged in the same common enterprise at the time of the wreck, subject to the control and direction of the same general master, engaged in the same common employment or pursuit? A. No.

"29. If you find that the water-way at the place of the accident was deficient in dimensions, was the fact thereof equally within the knowledge of the plaintiff and defendant, and did the plaintiff have as good opportunity to discover the same as the defendant? A. No.

"30. In what amount was the plaintiff actually damaged by reason of the injury complained of in his petition? A. $10,000.

"31. Were the water-ways in the valley at the place of the wreck of sufficient dimensions to carry off all the water which the defendant company, by the exercise of prudence and care, had reason to anticipate at the time of the construction of the road would fall in that valley? A. No.

"32. Would a water-gap fifty feet wide have carried off the water which came down the valley that night without running over the track? A. Don't know.

"33. Were the water-ways and water-gaps clear and unobstructed up to the time of the accident? A. Yes.

"34. Were the water-ways and gaps of the road at this point of sufficient capacity to carry off the water which came down the valley during the severest storms, from the time of the construction of the road to the time when the wreck occurred? A. No.

"35. Was G. W. Turner, the master carpenter who superintended the construction and maintenance of the water-ways at the place of the wreck, a competent, skillful and careful man in his business, and did he in such construction and maintenance use due care and skill? A. Yes.

"36. If you find he was not or did not, state in what particular he was negligent. (Not answered.)

"37. Was ————, the bridge inspector, whose duty it was to examine the water-ways at or near the place where the accident occurred, a careful and skillful man; and did he, in the exercise of his duty, use a degree of care commensurate thereto? A. No.

"38. If you find he did not, state what he failed to do that he should have done. A. Ordered the culvert enlarged.

"39. Did the defendant company use due and adequate care to safely maintain its road-bed, water-ways and bridges at the place where the accident occurred? A. No.

"40. If you find it did not, state wherein it failed, and what particular officer, agent or employé it was who caused such failure. A. Building improper bridges; chief engineer.

"41. Did the defendant company, at the time it employed Charles Downing, have reason to believe him a sober, industrious, skillful and competent man for the purposes of his employment? A. Yes.

"42. At what rate of speed did the plaintiff cross the bridge over Clear creek, about half a mile below where the wreck occurred? A. Between 10 to 14 miles.

"43. Did the plaintiff increase the rate of speed after passing Clear creek, before coming to the place of the wreck? A. Don't think he did.

"44. Some indications of hard weather had preceded plaintiff before reaching the place of the wreck; did plaintiff observe anything at Clear creek to indicate that there was high water along the road? A. Not dangerously high.

"45. What precautions, if any, did plaintiff take in running his train that night, after seeing the high water in Clear creek? A. Ordinary precaution.

"46. To what rate of speed, under the rules of the com-

27—35 KAS.

pany, was plaintiff restricted in running over the bridge across Clear creek?    A. Ten miles per hour.

"47. Under the rules of the company, was it the duty of the section foreman to pass over, or send men over the track ahead of freight trains, after a storm?    A. Yes.

"48. What officer or employé of the railroad company had charge of keeping the track in repair where the injury occurred?    A. Section foreman.

"49. Would a person, in the exercise of ordinary care and caution, such as would be exercised by a prudent man, have come up the valley in which the plaintiff was injured, under the conditions and circumstances that the plaintiff in this case did, after seeing the high water in Clear creek, without first either sending some one ahead or having reduced the rate of speed of the train, so as to have brought it entirely within his control?    A. Yes.

"50. Was the water-gap at the place where the plaintiff was injured obstructed by flood-trash, grass, weeds, or otherwise, so as to prevent the free passage of water through the same prior to the storm on the night of the accident?    A. No.

"51. Was not the water in Clear creek, when plaintiff crossed it, higher than he had ever seen it prior to that time? A. Yes."

Special findings of fact in answer to special questions presented to the jury at the request of the plaintiff:

"1. Had plaintiff crossed the bridge over Clear creek about one-half mile before he came to the place where the train was wrecked?    A. Yes.

"2. Did the plaintiff find the roadway and bridge at and near Clear creek in safe condition at the time he crossed the same?    A. Yes.

"3. Did plaintiff know that the place where the wreck occurred was on a higher level than Clear creek?    A. Yes.

"4. Was there anything in the condition of Clear creek, or in the indications of the storm between Clear creek and the place of the wreck which would cause the plaintiff to believe that the track or culverts and water-ways in the upper valley were in any manner unsafe?    A. No.

"5. What was the plaintiff's age at the time of his injury? A. Thirty-six years.

"6. Had he at that time any other calling or occupation than that of locomotive engineer?    A. No.

"7. Had plaintiff been a locomotive engineer for about 14 years before his injury? A. Yes.

"8. Had plaintiff as such engineer earned and received from $3.50 to $4 per day for his services as such? A. Yes.

"9. Were the services of the plaintiff worth from $3.50 to $4 per day at the time of the injury? A. Yes.

"10. In time of high water in the valley where the wreck occurred, did the main channel of the creek overflow its banks? A. Yes.

"11. In case of overflow of the banks of the main channel of such creek, would a large part flow to the culvert, the washing out of which caused the injury to plaintiff? A. Yes.

"12. Could defendant have learned by exercise of reasonable diligence that the culvert at such place was insufficient in size to permit the free passage of water in time of high water or overflow? A. Yes.

"13. Could the section foreman, Downing, have gone from his section-house to the place of the wreck in twenty minutes and have discovered the wash-out? A. Yes.

"14. Was it the duty of such section foreman in time of heavy rain to inspect the road and report to train-men and officers of the road any defects therein? A. Yes.

"15. Did the section foreman on that section negligently fail to go over said road during and after a severe storm which prevailed there at that time and give men on train notice thereof? A. Yes.

"16. Was the road in question completed in August, 1881? A. Yes."

The court rendered judgment for the plaintiff and against the defendant for the amount of the verdict, with costs. To reverse this judgment *The Railway Company* brings the case to this court. The opinion contains a sufficient statement of the facts.

*John O'Day*, for plaintiff in error.

*Jackson & Royse*, and *Bowman & Bucher*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought in the district court of Harvey county, by John W. Weaver against the St.

Louis & San Francisco Railway Company, to recover for personal injuries alleged to have been caused by the negligence of the defendant and its employés. A trial was had before the court and a jury, and the jury rendered a general verdict in favor of the plaintiff and against the defendant, and assessed the damages at ten thousand dollars, and also made sixty-seven special findings of fact; and upon this general verdict and these special findings of fact, the court below rendered judgment in favor of the plaintiff and against the defendant and for the amount of the verdict, with costs. To reverse this judgment the defendant brings the case to this court.

The alleged injuries occurred on May 19, 1883, at about 3 o'clock in the morning, at a point on the defendant's railway where the same crosses Vernon valley, about four miles north

Statement of facts.

of Fayetteville, Washington county, Arkansas. The plaintiff at the time was a locomotive engineer in the employment of the defendant, and had charge of an engine drawing one of defendant's freight trains from Van Buren, Arkansas, northeasterly, to Rogers, in the same state. J. Workman was the fireman on the same train. James Dun was the defendant's chief civil engineer, and had the general charge of the construction and repairs of the defendant's railway. J. F. Hinckley was an assistant civil engineer under Dun. Samuel Lyman was the defendant's general roadmaster, John R. Ward was the division roadmaster for that division, and Charles Downing was the section foreman for that section, which includes the place where the accident and the alleged injuries occurred. The injuries were caused by the engine's running into a "wash-out" at the southeast side of Vernon valley, about 900 feet south of where the railway crosses the main channel of Vernon creek or Vernon branch. At the main channel of Vernon branch, a pile trestle, sixty feet wide and six feet high, was constructed for the water to pass through. At the place where the accident occurred, a wooden box culvert, six feet wide and four or five feet high, was constructed for the purpose of draining some low ground, and possibly also of carrying off a portion of the water that might

flow down Vernon valley during times of high water. The water at this place flowed from the east to the west, though the general course of the stream was from northeasterly to southwesterly, and except during times of wet weather no water passed through this culvert, but all passed through the pile trestle. At the time of the accident, a large volume of water was flowing down Vernon valley, and the high water of that night had washed out the culvert. The plaintiff's engine ran into the place where the culvert had been washed out, turned to the left, and turned over on its side; and while it was turning the plaintiff jumped from the cab window, on the upper side, and into a swift current of water. This current carried him back to the engine, which was still in motion, and his left arm was caught between the driving-rods of the engine, and was so crushed as to require amputation above his elbow and near the shoulder; and this injury and the incidental and consequent injuries, are the injuries of which the plaintiff now complains.

The first question involved in this case is, whether the court below had jurisdiction to try the case, or not. The plaintiff in error, defendant below, claims that the case was removed from the state district court to the United States circuit court. It appears that the defendant was at the time of the accident, and still is, a corporation organized under the laws of the state of Missouri, but besides doing business in the state of Missouri, it then did and still does business in both the states of Arkansas and Kansas. The plaintiff at the time of the accident was a resident of Arkansas. Afterward, and before commencing this action, he removed to and became a resident of the state of Missouri, and while a resident of the last-mentioned state he commenced this action in Kansas. He is still a resident of the state of Missouri. He commenced this action on December 17, 1883. On January 4, 1884, the defendant filed a general demurrer to the plaintiff's petition, upon the alleged ground that the petition did not "state facts sufficient to entitle the plaintiff to maintain his said action against the said defendant." On February 4, 1884, the demurrer

was overruled.    Afterward the defendant filed an answer, and also an amended answer, and the plaintiff replied thereto. Afterward, and on May 20, 1884, the defendant filed its petition and bond for a removal of the case to the circuit court of the United States; and afterward, and on October 13, 1884, filed its plea in abatement, claiming that the case had already been removed to the circuit court of the United States.    Both the application for the removal and the plea in abatement were overruled.

Now, passing over all other questions with regard to removal, we think the defendant made its application for removal too late.    It has been decided by the supreme court of the United States, in at least three cases, that a case cannot be removed from a state court to the federal courts under the act of congress of March 3, 1875, after a hearing has been had in the state court on a demurrer to the complaint because it did not state facts sufficient to constitute a cause of action. (*Alley v. Nott*, 111 U. S. 472; *Scharff v. Levy*, 112 id. 711; *Gregory v. Hartley*, 113 id. 742.)

1. No removal of case to federal court, when.

The next question is really one of fact: was the plaintiff guilty of contributory negligence?    The distance from Van Buren to the place where the accident occurred is 61 miles, and to Rogers, 77 miles.    When the plaintiff's train left Van Buren, which was on May 18, 1883, at 7:30 o'clock in the evening, it was raining slightly.    When the train reached West Fork, a distance of about 45 miles from Van Buren and 16 miles south of where the accident occurred, evidences were observed which indicated that a great storm had crossed the track.    At Fayetteville, four miles south of where the accident occurred, there were still evidences of rain, but no evidence of any great storm.    When the train crossed Clear creek, something over half a mile from where the accident occurred, it was noticed that the stream was unusually high; but from Clear creek to the place where the accident occurred the grade is ascending, and there was very little if anything to indicate danger until the train had approached very near to Vernon valley, where the accident occurred, and nothing to conclu-

sively show danger until the engine commenced to turn to
the left and to turn over, as aforesaid.   This was all in the
night-time, about 3 o'clock in the morning.   In Vernon
valley, where the railway crosses Vernon branch, or Vernon
creek, there is a pile trestle about sixty feet wide and six feet
high, for the water of Vernon branch to run through; and
this trestle is about 900 feet north from the culvert, or sluice-
way, as it was sometimes called, where the accident occurred.
The bed of Vernon creek is also a few feet higher than the
bottom of this culvert or the ground where it was placed.   It
was not intended that Vernon branch or any portion of the
stream itself should pass through this culvert, but the culvert
was really intended to carry off only the water from some low
ground adjacent thereto.   But in constructing the railway, in
putting in the pile trestle where the water of Vernon branch
was to run through, and digging a ditch from that point on
the east side of the railway to the point where the accident
occurred, and throwing up an embankment of solid earth on
which to place the railway track, the course of Vernon branch
was so changed that during times of high water a large pro-
portion of the water from the branch passed along the east
side of the railway to the culvert and ran through the culvert
and down a ravine to the main branch.   Upon these facts,
we cannot say, as a matter of law, that the plain-
tiff was guilty of culpable contributory negli-
gence.   We have not stated the facts in the great

2. Contributory
negligence;
finding, sus-
tained.

detail in which they were proved, but, taking all of them
just as they were proved, we cannot say, as a matter of law,
that the plaintiff was guilty of any culpable contributory
negligence; and therefore the findings of the jury, general and
special, that the plaintiff was not guilty of such negligence,
must be sustained.

It is claimed, however, that the burden of proof rests upon
the plaintiff to show that he was *not* guilty of contributory
negligence, and not upon the defendant to show
that he *was*.   The rule, however, in this state, is

3. Burden of
proof.

otherwise.  (*K. P. Rly. Co. v. Pointer*, 14 Kas. 38, 50; *K. C.*

*L. & S. Rld. Co. v. Phillibert*, 25 id. 583; see also Beach on Contributory Neg., 430, § 157.) The law presumes that every person performs his duty; and this presumption continues until it is shown affirmatively that he does not or has not· Hence, wherever there is no evidence upon the subject, or where the evidence is equally balanced, this presumption in favor of the person in question requires that the findings of the court and jury should be that such person has performed his duty and is not guilty of any culpable negligence, contributory or otherwise. Hence, while it may be said in a general sense that the burden of proving his case devolves upon the plaintiff, yet if he has shown that the defendant was guilty of the negligence causing the injury complained of, and the evidence tending to show that he has performed his duty is at least equal to that which tends to show otherwise, he has made out his case. This is virtually throwing the burden of proof to show that the plaintiff has been guilty of culpable contributory negligence upon the defendant; and this has been the uniform holding of this court.

The next general question is, whether it has been shown that the defendant was guilty of negligence. This question is principally one of fact. The principal negligence charged against the defendant in the present case is the failure of the defendant and its employés to put in a sufficient culvert at the place where the accident occurred, to carry off all the water which naturally flowed to it in times of high water, or which was caused to flow to it by reason of the manner in which the railway was constructed at Vernon valley; and also the failure of the defendant and its servants or agents to exercise reasonable diligence to discover the "wash-out" and to give the plaintiff and the other train-men proper warning of the danger before the accident occurred; and the principal agents of the defendant who are charged with negligence are the defendant's chief civil engineer and his assistants, and the section foreman of the section where the accident occurred, and his assistants. We have already stated how the railway track, trestle, embankments, ditches, culverts, etc., were constructed

at Vernon valley, so as to cause the principal portion of the water flowing down this valley during times of high water to flow down to this culvert, instead of passing through the pile trestle, through which it was intended that it should pass; and also the dimensions and capacity of the culvert. We would further state that the section foreman resided about three miles south of the place where the accident occurred, and had at the place of his residence assistants, hand-cars, lights, tools, torpedoes, signals, etc., and that he could have gone with a hand-car to the place where the accident occurred in about twenty minutes, and it was his duty to do so, but he did not. Taking all the facts and circumstances of this case together, we cannot say, as a matter of law, that the jury erred in finding as a matter of fact that the defendant was guilty of negligence in the respect aforesaid.

4. Negligence; finding sustained.

It is claimed, however, by the plaintiff in error, defendant below, that the section foreman was not a representative of the defendant as between the plaintiff and the defendant, but that the plaintiff and the section foreman were coëmployés, mere fellow-servants of the same master, in a common line of employment; and therefore that under the common law, which is admitted to be in force in Arkansas, where the accident occurred, the defendant is not liable to the plaintiff for the negligence of the section foreman. There is nothing in this case, however, to show what the courts or others in Arkansas consider to be the rule of the common law in cases of this kind, and there is a great difference of opinion prevailing in this country upon this subject; hence we must decide this case upon our own views as to what the rule of the common law in such cases is. It may be that our view of what the common law is, differs from that of the supreme court of Arkansas; but as it has not been proved in this case, as a matter of fact, what view the supreme court of Arkansas or the courts of that state take upon this question, it will be necessary, as before stated, for us to follow our own views as to what the common law upon this subject is.

7. Common law, when to govern; presumption.

If it had been proved in the case what view the supreme court of Arkansas has taken with respect to the common law in cases of this kind, we would follow its view; and this we would do even if its views should differ from ours. If within its views the plaintiff has no cause of action, we would also hold that he has no cause of action. We have no disposition to encourage persons who have no cause of action in their own state to come to Kansas and sue in this state with the possible intention of evading the laws of their own state, and because they may possibly believe that under the rules of law as administered in this state they might be allowed to recover, when they could not recover in their own state. Such would not be a proper administration of justice. If it be claimed, however, that we should take judicial notice of the common law of Arkansas, we would answer that we cannot do so.

6. Common law, judicial notice of. The courts of this state may take judicial notice of the common law of Kansas, and what it would be except for our own statutes or our own written law; and for this purpose our courts may take judicial notice of all the judicial decisions of this country and of all other countries which have adopted the common law of England. (*Hunter v. Ferguson*, 13 Kas. 463, 475, 476; *Division of Howard Co.*, 15 id. 194, 213; *City of Topeka v. Gillett*, 32 id. 431, 437.) But for the purpose that the courts of this state shall know as a fact in a particular case what the common law of some other state is, such law must be proved like any other fact. (*Porter v. Wells*, 6 Kas. 455; *Hunter v. Ferguson*, ante.) In Arkansas it is probable that a section foreman would be considered as a mere coëmployé, and in the same line of employment with a person assisting in operating a railroad train for the same employer; but such is not the view taken by this court. In the case of the *A. T. & S. F. Rld. Co. v. Moore*, 29 Kas. 633, 644; same case, 11 Am. & Eng. Rld. Cases, 243, 251, the section foreman, or section boss, as he is there called, is mentioned as a representative of the railroad company as between the railroad company and the train-men; and in that case as there reported, and in a subsequent decision of the same case, re-

ported in 31 Kas. 197; 15 Am. & Eng. Rld. Cases, 312, it was held that the roadmaster, as between a railroad company and the train-men, is the representative of the company, and that the company is liable to such train-men for the negligence of the roadmaster. (See also note to last-mentioned case, 15 Am. & Eng. Rld. Cases, 315. See also the following cases, following in the same line: *H. & St. J. Rld. Co. v. Fox*, 31 Kas. 586; same case, 15 Am. & Eng. Rld. Cases, 325; *A. T. & S. F. Rld. Co. v. Holt*, 29 Kas. 149; same case, 11 Am. & Eng. Rld. Cases, 206. Also, in the same line, see the following cases: *Lewis v. St. L. & I. M. Rld. Co.*, 59 Mo. 495; *Dale v. St. L. K. C. & N. Rld. Co.*, 63 id. 455; *Hall v. M. P. Rly. Co.*, 74 id. 293; *Vautrain v. St. L. I. M. & S. Rly. Co.*, 8 Mo. App. 538; *L. & N. Rld. Co. v. Bowler*, 9 Heisk. 866; *Hardy v. N. C. C. Rld. Co.*, 74 N. C. 734; *Hardy v. C. C. Rld. Co.*, 76 id. 5; *Davis v. Rld. Co.*, 55 Vt. 84; same case, 11 Am. & Eng. Rld. Cases, 173; *C. & N. W. Rld. Co. v. Swett*, 45 Ill. 197; *O'Donnell v. A. V. Rld. Co.*, 59 Pa. St. 239; *Cook v. St. Paul, M. & M. Rly. Co.*, 24 N. W. Rep. 311; *Kelly v. E. T. & T. Co.*, 25 id. 706; *Copper v. Louisville &c. Rly. Co.*, 2 N. E. Rep. 749; *Paulmier v. Erie Rld. Co.*, 34 N. J. L. 151; *H. & T. C. Rly. Co. v. Dunham*, 49 Tex. 181; *Snow v. Housatonic Rly. Co.*, 90 Mass. 441; *Brickman v. S. C. Rld. Co.*, 8 S. C. 173; *Col. C. Rld. Co. v. Ogden*, 3 Col. 499; *Thayer v. St. L. A. & T. H. Rld. Co.*, 22 Ind. 26; *Ind. Car Co. v. Parker*, 100 id. 181; *Atlas Engine Works v. Randall*, 100 id. 293; *Central Rld. Co. v. Mitchell*, 63 Ga. 173; same case, 1 Am. & Eng. Rld. Cases, 145; *Hough v. Rly. Co.*, 100 U. S. 213.)

There are two classes of cases in which the employés of the same master are not such coëmployés that one of such employés may not recover for injuries caused by the negligence of another employé while all are engaged in transacting some portion or portions of the common master's business. The first class is where the negligent employé is one who has the general management of or control over some portion or line of the master's busi-

s. Master—when liable, when not.

ness, and has control over the injured employé and the other employés engaged in that portion or line of business. A good illustration of this class is found in the case of *C. M. & St. P. Rld. Co. v. Ross*, 112 U. S. 377; same case, 17 Am. & Eng. Rld. Cases, 501. This is an extreme case, however, and is in conflict with the weight of authority in this country. See, also, and as another illustration of this class of cases, the case of the *L. & N. Rld. Co. v. Bowler*, 9 Heisk. 866, where it was held that the section boss and his subordinates were not fellow-servants with each other. This is another extreme case. These cases are not controlling in this case, however, even if they properly state the law; for although the section foreman in this case hired, controlled and discharged his subordinates, yet the plaintiff was not one of his subordinates and did not work with him or under him. The other class of cases where the employés of the same master are not considered such co-employés that the master will be liable to one employé for the negligence of another employé, is where two or more sets of employés are engaged in different lines of employment; as, for instance, where one set of employés has charge of a rail-road train and its operation, while the other set is to keep the road in proper condition and repair. Numerous cases illustrating this class of cases have already been given. See last preceding page. It was said in the case of the *A. T. & S. F. Rld. Co. v. Moore*, 29 Kas. 644, as follows:

"It [the railroad company] was simply bound, through certain of its employés — the roadmaster and *section boss*, for instance — to use reasonable and ordinary care and diligence to keep its road in proper condition; and such employés, with respect to those who operate the road, represent the company, and indeed are the same as the company. In all cases, at common law, a master assumes the duty toward his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work, with reasonably safe machinery, tools and implements to work with, with reasonably safe materials to work upon, and with suitable and competent fellow-servants to work with him; and when the master has properly discharged these duties, then, at common law, the servant assumes all the risks and hazards incident to

or attendant upon the exercise of the particular employment or the performance of the particular work, including those risks and hazards resulting from the possible negligence and carelessness of his fellow-servants and coëmployés. *And at common law, whenever the master delegates to any officer, servant, agent, or employé, high or low, the performance of any of the duties above mentioned, which really devolves upon the master himself, then such officer, servant, agent, or employé stands in the place of the master and becomes a substitute for the master, a vice-principal, and the master is liable for his acts or his negligence to the same extent as though the master himself had performed the acts or was guilty of the negligence.*"

In the present case the roadmaster, the division roadmaster and the section foreman and his assistants were in one line of duty, while the train-men were in another and a different line of duty, and each set within its own line of employment represented the master as to the other set; and the members of one set were not the mere *fellow-servants* with the members of the other set. The principal ground upon which the doctrine has been established that the master is not liable for any negligence that might take place as between mere fellow-servants is, that such fellow-servants work together in the same line of employment, are intimately acquainted with each other, and knowing each other better than the master could possibly know any one of them, they take all risks of negligence on the part of their fellow-servants; that if any servant chooses to work with a known incompetent or negligent fellow-servant, without informing the master, he himself should take all the risks and consequences of his fellow-servant's negligence and incapacity, the master being required only to use reasonable and ordinary care and diligence in the original employment and the subsequent retention of only such servants as are competent and habitually careful. (*Dow v. K. P. Rly. Co.*, 8 Kas. 642, 646.) But where employés work in different lines of employment, one having no means of knowing anything about the business or qualifications of the other, and being wholly unacquainted with the other, they cannot be said to be fellow-servants within the meaning

of the foregoing rule; and this state of things fairly represents the condition of a railroad section foreman and an engineer on a freight train, and the relation existing between them. Therefore, where a railroad company delegates, directly or indirectly, to a section boss or section foreman the duty of keeping a certain section of the railroad in proper condition and repair, and to warn train-men in case of danger, and the section boss fails to perform his duty in these respects, and a train-man is injured by reason of such negligence, the railroad company is responsible.

It is claimed that the court committed error in the conduct of the trial of this case in many particulars. One of the first errors of this kind complained of is, that the court admitted the testimony of J. R. Ward, the division roadmaster, with respect to statements made by James Dun, the defendant's chief civil engineer. These statements were made prior to the time of the occurrence of the accident, and were made while Ward was the division roadmaster for that division of the defendant's railway, and while Dun was the defendant's chief civil engineer. The statements of Dun were brought about in the following manner: Dun asked Ward if the heavy rains at any time had given Ward any trouble at the place where the accident occurred, and Ward told him that they had never had any trouble there; and Ward then made the statements complained of. The testimony of Ward showing this, reads as follows: "He [Dun] asked me the question if the heavy rains at any time had given me any trouble there." "I told him we had never had any trouble there with high water. He said that he had been uneasy about that place; that he had been detained there by high water when locating the road." At the time when this conversation occurred between Dun and Ward, it was the duty of Dun to see that the railway was properly constructed, and it was the duty of Ward to see that that division of the railway was in proper condition and repair; and this conversation was really a consultation, a conference concerning matters within the line of their duty, the conversation itself was within the line

of their duty, and the declaration of Dun formed a part of the consultation, a part of the *res gestœ.* The purpose of introducing this evidence was to show that the railway company had notice of the character and condition of its railway and of the danger at the place where the accident subsequently occurred; and as it was the duty of the chief engineer and the division roadmaster to see that the road was safe and in proper condition, notice to them was notice to the defendant. Authorities showing that the declarations of agents, not made while in the performance of the agent's duty nor forming any part of the *res gestœ,* have no application to this case. The following cases we think have application to this case: *Brehm v. C. W. Rly. Co.,* 34 Barb. 257, 275; *B. & O. Rld. Co. v. State of Maryland,* 19 Am. & Eng. Rld. Cases, 83; *L. N. A. & C. Rly. Co. v. Henley,* 88 Ind. 535, 539; same case, 12 Am. & Eng. Rld. Cases, 301–304; *Baldwin v. St. L. K. & M. Rly. Co.,* 25 N. W. Rep. 918; *Locke v. S. C. & P. Rld. Co.,* 46 Iowa, 109; *M. D. T. Co. v. Leysor,* 89 Ill. 44; *Col. Cen. Rld. Co. v. Ogden,* 3 Col. 499; *McGenness v. Adriatic Mills,* 116 Mass. 177; *National Bank v. Stewart,* 5 S. C. Rep. 845; *C. B. U. P. Rld. Co. v. Butman,* 22 Kas. 640, 642; *K. P. Rly. Co. v. Little,* 19 id. 267, 272. We cannot say that the court below erred in permitting the statements of Dun to be given to the jury.

9. Evidence—conversation between civil engineer and roadmaster, no error in admitting.

It is further claimed by the defendant below, plaintiff in error, that the court below erred in permitting the plaintiff below to impeach one of his own witnesses. It is possible that the court below committed a slight error in this respect, but still a matter of this kind is so largely within the sound judicial discretion of the trial court, that we cannot say that any reversible error was committed in the present case. There was no attempt to impeach the witness generally, or to impeach his evidence generally, but the only attempt was to show that he had made a statement out of court, and by a letter to the plaintiff, which was different from his testimony upon a particular subject in

10. Impeachment of party's own witness.

court. The supposed error arose as follows: D. Workman was the fireman on the plaintiff's engine at the time the accident occurred. The plaintiff introduced him as a witness for the purpose of proving that the train was not moving at the time the accident occurred at a speed greater than from twelve to fourteen miles an hour, but he testified that the train was moving at that time at the rate of from fifteen to eighteen miles an hour. The plaintiff then, for the purpose of impeaching this testimony, introduced a letter from Workman to the plaintiff, in answer to a letter from the plaintiff to Workman, in which first-mentioned letter Workman stated that the train was moving at the time only at the rate of from twelve to fourteen miles an hour. The plaintiff had also taken the deposition of Workman, in which he testified that the train was moving only at the rate of from ten to fourteen miles an hour; but as Workman was present at the trial the plaintiff could not introduce the deposition as original evidence. If the court erred at all, it was in not requiring the plaintiff to show by stronger evidence than he did that the plaintiff was surprised at Workman's testimony. But taking all the testimony together, and the fact that this testimony is of but little importance in the case, we cannot say that the court below so abused its discretion or committed such material error in permitting the plaintiff to impeach his own witness, that the judgment of the court below must be reversed therefor.

The plaintiff in error, defendant below, also claims that the court below committed error in permitting the plaintiff to introduce evidence showing that the defendant, after the culvert was washed out, put in another culvert or bridge of greater dimensions, so as to permit a greater amount of water to pass through. The defendant can hardly claim that this was a material error, for the defendant also proved the same fact. And if error at all, it was a very slight and trifling one under all the facts of the case. But was it error? The making of the passage-way larger than it had formerly been was an admission, slight it may be, and of but little value, but still an

admission, on the part of the defendant that the passage-way had previously been too small. And why might not the jury consider such evidence for what it was worth? Many authorities sustain the introduction of this kind of evidence. (*St. J. & D. C. Rld. Co. v. Chase*, 11 Kas. 47; *A. T. & S. F. Rld. Co. v. Retford*, 18 id. 249; *City of Emporia v. Schmidling*, 33 id. 485; *W. C. & P. Rld. Co. v. McElwee*, 67 Pa. St. 311, 314; *K. P. Rly. Co. v. Miller*, 2 Col. 443, 468, 469; *O'Leary v. City of Mankato*, 21 Minn. 65; *Phelps v. City of Mankato*, 23 id. 279; *Kelley v. S. M. Rly. Co.*, 28 id. 98; *Brehm v. C. W. Rly. Co.*, 34 Barb. 256; *Westfall v. Erie Rly. Co.*, 5 Hun, 75; *Sewell v. City of Cohoes*, 11 id. 626; *Harvey v. N. Y. C. & H. R. Rld. Co.*, 19 id. 556; *Readman v. Conway*, 126 Mass. 374.) It is evidence in the nature of *an admission from conduct;* and many illustrations of such kind of evidence might be given. It is frequently resorted to in criminal cases. The

**11. Repairs after accident, as evidence.** evidence of this change in the dimensions of the water-way does not of itself prove negligence; it does not prove that the railway company had notice of the insufficiency of the culvert prior to the accident, nor that it might have had such notice by the exercise of reasonable diligence, nor that it did not exercise such diligence. It at most only tended to prove by way of admission and as a fact that the culvert was too small, and that the company obtained knowledge of the same, *not before, but after* the accident. Of course the change of any structure or appliance, to be of any value as evidence, must be made soon after the accident, and seemingly have some connection therewith. This is so held by some of the following authorities, while others of the following authorities hold that the evidence *is wholly incompetent under all circumstances: Salters v. D. & H. Canal Co.*, 3 Hun, 338; *Payne v. T. & B. Rld. Co.*, 9 id. 526; *Baird v. Daly*, 68 N. Y. 547; *Dale v. D. L. & W. Rld. Co.*, 73 id. 468; *Morse v. M. & St. L. Rly. Co.*, 30 Minn. 465; same case, 11 Am. & Eng. Rld. Cases, 168; *Cramer v. City of Burlington*, 45 Iowa, 627; *Hudson v. C. & N. W. Rld. Co.*, 59

id. 581. We do not think that the court below committed error in admitting the foregoing evidence.

We do not think that the court below committed material error, or any error, in refusing to permit evidence to be introduced with regard to the speed-register. It was not sufficiently identified, nor was any sufficient preliminary evidence introduced to authorize its introduction. Neither do we think that any of the instructions to the jury were materially erroneous. If we should put the same construction upon some of the instructions given to the jury as the plaintiff in error, defendant below, does, we should have to hold them erroneous. The plaintiff in error claims that by some of the instructions a railway company is required to guarantee the sufficiency, good order and good condition of its track and roadway. Of course such is not the law. The law merely requires that railway companies shall exercise reasonable and ordinary care and diligence to keep their tracks and roadways in a reasonably safe condition. (*A. T. & S. F. Rld. Co. v. Wagner*, 33 Kas. 660; same case, 21 Am. & Eng. Rld. Cases, 637; *A. T. & S. F. Rld. Co. v. Ledbetter*, 34 Kas. 326; same case, 21 Am. & Eng. Rld. Cases, 555.) But taking the entire charge of the court, it is evident that the court did not intend to instruct the jury as the plaintiff in error claims. On the contrary, we think the court intended to instruct the jury that the law is just as we have stated it to be. But even if the court had instructed the jury as the plaintiff in error claims, still, under the findings of the jury, the error would be immaterial; for the jury found that the injuries resulted not only from the negligence of the defendant below in the improper construction of the water-ways, but also in the negligent failure of the section foreman to pass over his section of the railway before the accident occurred, and to warn the train-men of the danger; and as before stated, it is the opinion of this court that the railway company is responsible to the train-men for the negligence of the section foreman. Neither do we think that it makes any difference

12. Railroad company to keep track and roadway safe.

that the defendant did not originally construct its railway. It is true of a great many railroad companies, that they do not construct their own roads; but nevertheless, a railroad com-

**13. Company to make road safe.** pany must exercise reasonable and ordinary diligence to make its road safe, whether it originally constructed the road, or purchased it, or leased the same. Neither did the court commit any material error in refusing to give instructions. Some of the instructions asked for by the defendant and refused, are not good law, or proper in the case. Some of them were substantially given in the general charge of the court, and some of them were rendered wholly immaterial by the special findings of the jury. All the material findings of the jury were sustained by sufficient evidence; and while we might agree with the plaintiff in error, defendant below, that the verdict of the jury is excessive, yet it is not sufficiently excessive to authorize a reversal of the judgment of the court below, when the trial seems otherwise to have been fair.

The judgment of the court below will be affirmed.

JOHNSTON, J., concurring.

HORTON, C. J.: I place my affirmance of the judgment of the district court, in this case, upon the following grounds: The petition of Weaver alleges, among other things, that his injury was caused by the carelessness and negligence of the section foreman of the railway company in failing and neglecting to go over the railroad track after a heavy and severe storm which occurred along the road on the night of the 18th of May, 1883, to ascertain whether any damage had been done thereby to the road-bed, and for failing and neglecting to notify Weaver and other employés of the railway company upon the train with Weaver of the wash-out, as it was his duty to do, and which, in the reasonable discharge of his duties, he should have done, and which, if so done, would have prevented the injury inflicted. The evidence shows that Charles Downing was the section foreman in charge of the road-bed where Weaver was injured. He had been in charge

of his section from six to nine months. There was a severe rain-storm on the night that Weaver's engine was derailed, some of the witnesses stating that the rainfall was unprecedented. It commenced raining at Downing's section-house about five o'clock in the evening, and rained up to eleven or twelve o'clock — perhaps later. The storm ceased before two o'clock. The injury occurred about three o'clock in the morning. The road-bed where Weaver's engine was derailed was washed out for a great distance. The section-house where Downing, the section foreman stopped, was three or four miles from the wash-out. In the section-house the foreman and two section-men slept, and at this house there was a hand-car, lanterns, torpedoes, signals and tools for inspecting and repairing the track, and implements for giving signals to trains, etc. C. W. Rogers, the general superintendent of the railway company, testified that the general orders of his company in relation to section foremen going over the road were that "they were to precede every passenger train, and in case of heavy or extraordinary storms, to go over the road carefully before any train." Among other rules upon the time-card of the railway company, were the following:

"During the continuance, and after storms of rain, wind, or snow, section foremen will always be required to see that the track is not obstructed by fallen trees, driftwood, brush, stones, etc., and to precede each passenger train run in the night by sending two or three men over their section with their hand-cars and lights to see that the track is clear, and if necessary, notify trains of any obstruction or defect. This rule will be strictly enforced against section foremen."

"All persons employed upon the road must give timely notice of any obstruction to the passage of trains, by exhibiting a flag, etc., and must notify all passing trains."

The jury found, upon the evidence before them, that Downing had charge of keeping the track in repair where Weaver was injured; that he could have gone from his section-house to the place of the wreck in twenty minutes and discovered the wash-out; that it was his duty, in time of heavy rains, to inspect the road and report to the train-men and officers of

the road any defects therein; that he neglected and failed to go over the road during and after the severe storm which prevailed before the engine was derailed, and neglected and failed to give the men on the train notice of the wash-out. If Downing had performed his duty and gone over the road before the arrival of the train drawn by Weaver's engine, he would have had knowledge of the wash-out and could have put out danger signals so as to have stopped the train, and thereby prevented the wreck. The derailment of the engine, the wreck of the train, and the injury to Weaver, were caused by Downing's negligence. He, as the section foreman, did not bear the relation of fellow-servant or mere coëmployé in the same line of employment with Weaver, the engineer. He represented the railway company, and the company is responsible to Weaver for the injuries which, through his negligence, were inflicted upon him. If a section foreman, under the decisions of Arkansas, where Weaver was injured, is regarded as a servant or coëmployé in the same employment with the engineer operating an engine, such decisions should have been introduced in evidence, as stated in the above opinion. In the absence of any evidence of such a construction of the common law by the Arkansas courts, this case must be disposed of upon the interpretation given in this state to the rule of the common law. The burden of proof that Weaver was guilty of contributory negligence was upon the railway company. Upon this question, the findings and judgment were against the company. There is evidence to support these findings, and therefore it cannot be said that Weaver was guilty of negligence.